ALLIS–CHALMERS MANUFACTURING
COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 14853.

United States Court of Appeals
Seventh Circuit.

March 11, 1966.

Hastings, Chief Judge, and Kiley
and Swygert, Circuit Judges, dissented.

John L. Waddleton, Howard C. Equitz, Maxwell H. Herriott, and James Urdan, Milwaukee, Wis., for petitioner.

Marcel Mallet-Prevost, Norton J. Come, Assts. Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Joseph L. Rauh, Jr., John Silard, Washington, D. C., Stephen I. Schlossberg, Detroit, Mich., Philip L. Padden, Milwaukee, Wis., for respondent.

Harold A. Katz, Chicago, Ill., for intervenor.

Before HASTINGS, Chief Judge, and DUFFY, SCHNACKENBERG, KNOCH, CASTLE, KILEY and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

Allis-Chalmers Manufacturing Company, petitioner, sought to review and set aside the action of the National Labor Relations Board, respondent, in dismissing Allis-Chalmers' complaint against Locals 248 and 401 of International Union, UAW-AFL-CIO, who are bargaining agents for certain Allis Chalmers' employees. The Union was charged with unfair labor practices in fining members who had crossed picket lines during two different strikes. The original opinion of this Court which issued September 13, 1965, denied Allis-Chalmers' petition for review.*

---

* As set out in our original opinion:

The facts are stipulated. The two locals in question are bargaining agents at the employer's West Allis and La-Crosse, Wisconsin plants. The collective bargaining agreements at both plants contain union security clauses which require that employees join the union within thirty days after hiring and "remain members of the Union to the extent of paying dues." Both locals struck the Allis-Chalmers plants, on economic issues, from February 2 to approximately April 20, 1959, and again between February 26 and approximately March 5, 1962. During each strike some employee-members of the union crossed the picket lines and worked.

Each strike was called in accordance with the procedures prescribed by the constitution of the International union: a majority agreement to hold a formal strike vote, notification to all members of the vote, approval of the strike by at least a two-thirds majority in secret balloting, followed by approval of the International Executive Board. After each strike formal written charges of violations of the International constitution and by-laws were served on the offending members, followed by formal adversary hearings before union Trial Boards resulting in fines ranging from $20.00 to $100.00.[1]

1. One hundred dollars is the maximum fine permissible under the union constitution. Since each crossing of the picket lines was treated as a separate offense, the fines in some cases could have been considerably greater than those actually imposed.

Some of the members have paid the fines in whole or in part, but others have refused to pay. The union has attempted to collect the fines but has made no effort to have members who refuse to pay them discharged, nor to affect their employment status in any way. No members have been expelled or suspended from the union, nor have any resigned, for any reason arising from the disciplinary proceedings. In a test suit brought against one member who refused to pay a fine, one of the locals recovered a judgment in the County

We granted petition for rehearing en banc in this case for a number of reasons, including the following:

(a) the national significance of our decision to management and labor alike, as well as to other courts dealing with kindred or related matters;

(b) an asserted conflict with our prior ruling in Allen Bradley Company v. N. L. R. B., 7 Cir., 1961, 286 F.2d 442;

(c) an opportunity for a critical re-evaluation of their respective positions by members of the original panel;

(d) our natural desire to maintain the historical liberty of the American working man to remain free to work without coercion from employers *or* from unions; and to preserve the traditional character of American labor organizations which, largely through voluntary association, have contributed toward raising the living standards of our working people in this country to the highest plane known anywhere in the world.

As set out in our original opinion:

The issue before us is whether a union which imposes fines upon its members for crossing a picket line of the union and seeks to secure payment of the fines by suing or by threat of suit is guilty of violating the prohibition, in Section 8(b) (1) (A) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C. § 141, et seq., against union action restraining or coercing employees in the exercise of rights guaranteed by Section 7 of the Act.

The maximum fine permitted under the Union constitution was $100 with each crossing of the picket lines treated as a separate offense. Consecutive fines may run into thousands of dollars creating a far greater burden on the working man than expulsion from his labor organization or even loss of job.

Section 7 of the Labor Management Relations Act, 29 U.S.C. § 157, provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title.

■ The parties agreed that generally employees have the right not to strike and that the Union may expel its members for any reason authorized by its rules, but that the Union may not demand the discharge of an employee or other adverse change of his employment status except for non-payment of uniform initiation fees and dues.

Section 8 of the Act, 29 U.S.C. § 158, provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section [7] of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *

Allis-Chalmers contended that union members who cross their own union picket lines are exercising their rights under § 7 to refrain from engaging in a particular concerted activity, and that union discipline for such activity violates § 8(b) (1) (A) if it takes any form other than expulsion from the union. This contention, of course, rests on a literal reading of § 7.

Court of Milwaukee County, Wisconsin, which was affirmed on appeal to the Circuit Court of Milwaukee County,

and, this court is informed, is now under advisement by the Wisconsin Supreme Court.

In our original opinion, we mistakenly took the position that such a literal reading was unwarranted in the light of the history and purposes of the section.

We relied on certain aspects of the legislative history, as, for example, committee reports indicating that wildcat and sitdown strikes, although "concerted" activities, were not included in the activities protected by § 7; and the fact that the original proposals of the House and Senate (prior to the 1947 Taft-Hartley amendments) which did include a number of restrictions on union-membership dealings, nevertheless did not specifically prohibit union fines for strikebreaking, although Congress must have been aware of union disciplinary practices and did specifically make provision permitting disciplinary expulsion. Reference was also made to Senator Taft's remarks that the pending measure did not propose any limitation with respect to the internal affairs of unions. However, he did go on to speak only of discipline by expulsion and to say that the only result of the provision under discussion was that a union "firing" a member for some reason other than nonpayment of dues could not force the member's employer to discharge him. It now appears that he had reference to § 8(a) (3), as when he was clearly speaking of § 8(b) (1) (A) he said that the union could conduct any form of propaganda it chose to persuade but could not by threat of economic reprisal prevent its members from exercising their right to work and that, as he saw it, was the effect of the amendment, which was adopted shortly after these remarks.

We also laid emphasis on Congressional concern with the use or threat of use of various forms of violent coercion and the elimination of "repressive tactics bordering on violence or involving particularized threats of economic reprisal" as quoted from the opinion in N. L. R. B. v. Drivers, Chauffeurs, Helpers, Local Union No. 639, Int. Bro. Teamsters, etc. (Curtis Bros.) 362 U.S. 274, 286–287, 80 S.Ct. 706, 714, 4 L.Ed.2d 710 (1960) and concluded incorrectly, we now believe, that economic reprisal meant only such things as securing discharge or reductions in pay or seniority but not imposition of fines.

In formulating our original opinion, we gave favorable consideration to the following arguments:

1. A member ought not to enjoy all the benefits of union membership while relinquishing none of the advantages of non-union membership.

2. Congress would have been guilty of inconsistency in adopting 29 U.S.C.A. § 411(a) (2) which allows unions to enforce reasonable rules as to the responsibility of members with respect to refraining from conduct that interfered with the union's legal and contractual obligations, if Congress were also prohibiting imposition of fines for members who crossed picket lines.

3. If a union's disciplinary powers are limited to expulsion, a union must choose between permitting anarchy in its ranks or depleting its strength, and Congress could not have intended to present unions with so invidious a choice.

4. A fine may be a lesser penalty than expulsion with attendant loss of union insurance and other benefits, and Congress would not have allowed the more severe while withholding the less serious form of punishment.

5. If a union may not fine strikebreakers, then it cannot fine wildcat strikers and cannot enforce a "no strike" clause in its contract.

6. An analogy was drawn between an industrial union and a democratic society where the majority vote rules, forgetting that a union is largely the creature of statute, that it differs in many ways from other secular societies freely joined and equally freely abandoned by individuals who disagree with the majority, and who are free to withdraw their moral and financial support at any time.

7. Our statement in Allen Bradley Co. v. N. L. R. B., 7 Cir., 1961, 286 F.2d 442, that fines for crossing picket lines imposed a sanction on the exercise of the

right to work guaranteed by the Act was mere dictum, as in that case, we held a proposal to limit unions' rights to fine or discipline its members for crossing picket lines was a subject of mandatory bargaining. It was suggested that it was somehow inconsistent to require bargaining with respect to a prohibited activity.

On rehearing, fortified with the additional arguments of counsel, and after discussion with all members of our Court, we conclude that the foregoing reasons set out in support of our prior opinion lack validity.

■ The statutes in question present no ambiguities whatsoever, and therefore do not require recourse to legislative history for clarification. The wording used evolved out of extensive Congressional debate and study. Although in our original opinion we rejected a literal reading of the statutes, in effect, we conceded that such a literal reading would require reversal of the Board's Order.

As interpreted in our original opinion these statutes would protect a union member from his union's coercive threats to take away his wages by securing his discharge from employment, but would not protect him from his union's coercive threats to take away his wages by imposition of fines. A substantial fine such as permitted here may easily pose a greater threat to a member than simple expulsion from the union.

■ Congress has determined what rights the employee may retain while availing himself of the benefits of union membership. All the protections which Congress has seen fit to throw about the union member operate to diminish the authority and power of the union to police its members by coercion and to that degree impose on the union the burden of achieving its ends by persuasion, rather than by penal exaction.

Recent history has demonstrated the extreme and far reaching effect of the irresponsible exercise of power and the resulting confusion and loss wreaked on labor, management, and the general public. On the other hand, we, as do all right-thinking citizens, hold those labor leaders in highest respect and esteem, whose authority is based on voluntary association rather than coercion, and who, fortified with the weapons Congress has deemed advisable, carry out their legitimate activities on behalf of their members. Such labor leaders have created a beneficent climate in which labor, management, and the general public may thrive without peril to that priceless American heritage; namely, the right of freedom to work and to organize on a voluntary basis.

We should never forget, nor should we let our fellow citizens forget, that in the all-inclusive, authoritarian state, represented as our common enemy today, the individual rights of the worker and the collective rights of organized workers have been completely appropriated. The state produces but one by-product and that is absolute and abject slavery. Thus ends the right to strike for increased wages or better working conditions. There is no redress of grievances, no individual management of business to create a strong economy for the commonweal. Each and every person does exactly what he is told to do, nothing more and nothing less. It is more important for the individual laboring man to be free and for his labor organization to be free than for any other segment of our society. Our greatness in the past, in the present, and, we prophesy, in the future, stems from those who toil.

■ The expressed Congressional policy of protecting the union member is particularly apt where, as in the case before us, membership is the result not of individual voluntary choice but of the insertion of a union security provision in the contract under which a substantial minority of the employees may have been forced into membership. Such membership properly incurs an obligation to pay dues and fees but may not be extended to include liability to submit to fines for indulging in a protected activity. Radio Officers Union of Connecticut v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L. Ed. 455 (1954).

A union concerned about preventing wildcat strikes or other illegal activities may be reassured by the fact that such practices are not protected activities. Employer disciplinary action will adequately assist a union faced with recalcitrant members who defy a "no strike" provision in a contract. It is not necessary to whittle down the protections provided for all employees by § 7.

■ Our original decision in this case does conflict with our ruling in *Allen Bradley*. The quoted statement was not mere dictum. Because fines for crossing picket lines did not relate to the internal affairs of the union but seriously affected the rights of both the employees and the employer, we held the authority to fine was a subject for bargaining. Activity already prohibited by statute is not by virtue of that fact alone barred from further prohibition by a provision in a contract. See Reed & Prince Mfg. Co., 96 NLRB 850, 855, where the Board said "We cannot conceive of a good faith basis for a refusal to incorporate a statutory obligation into a contract in the very words of the statute."

■ If the Congress did not mean to say what Congress has so clearly said, then Congress itself must indicate that fact by legislative enactment. This Court should not attempt to change the plain wording of this statute by judicial interpretation.

■ Study of the Taft-Hartley legislative history as a whole reveals a clear Congressional intent to balance the national labor policy by placing limitations on coercive union conduct similar to those previously prescribed for employers.

■ Having carefully reviewed our prior opinion in this case by a rehearing en banc, we now withdraw and reverse it.

The action of the Board in dismissing the complaints of petitioner is reversed, and this matter is remanded to the Board for further proceedings not inconsistent with the tenor of this opinion.

Reversed and remanded.

HASTINGS, Chief Judge (dissenting).

On September 13, 1965, a division of this court unanimously rendered a judgment and filed an opinion denying the petition of Allis-Chalmers Manufacturing Company to review and set aside an order of the National Labor Relations Board. The Board order under consideration dismissed complaints charging the Union [1] with unfair labor practices based on charges filed by Allis-Chalmers.

Subsequently, our court, by a vote of 6-1, granted the petition of Allis-Chalmers for a rehearing *en banc* with respect to its judgment entered September 13, 1965. I joined in the action to grant a rehearing *en banc* for the reason that two members of the division which heard the case originally voted for the rehearing *en banc*, and because of the importance of the question involved in this review.

On such rehearing *en banc*, a majority of our court decided to withdraw the prior opinion and judgment of the division which heard the original review and reached a contrary result.

In short, the majority holds that a union which imposes fines upon its members for crossing a picket line of the union and seeks to secure payment of the fines by suit or by threat of suit is guilty of violating the prohibition, in Section 8(b) (1) (A) [2] of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 141, et seq., against union action restraining or coercing employees

---

1. Locals 248 and 401 of International Union, UAW–AFL–CIO.

2. "It shall be an unfair labor practice for a labor organization or its agents—
    (1) to restrain or coerce (A) employees in the exercise of the rights

guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *." 29 U.S.C.A. § 158.

in the exercise of rights guaranteed by Section 7 [3] of the Act.

The effect of this holding is to say that the employees of Allis-Chalmers have a statutory right to belong to the Union on their own terms; to deny the Union the right to regulate its internal affairs; to rule that the disciplinary action taken by the Union infringes upon the rights of the dissident members protected by Section 7 of the Act; and to rule that such disciplinary action by the Union constitutes restraint or coercion within the meaning of Section 8(b) (1) of the Act.

I feel compelled to dissent from the result reached by the learned majority in this rehearing *en banc*.

I cannot agree that the Union action in this case violates Section 7 of the Act.

In substance, Section 7 grants to an *employee* the right of self-organization for collective bargaining purposes and to refrain from concerted activities, including an economic strike. It does not necessarily follow that *an employee who is a union member* may claim the same right of self-organization for collective bargaining purposes and at the same time claim the right to belong to the labor organization on his own terms. I cannot believe the Congress intended any such result.

I shall not belabor the legislative history of the Act, except to say that it is perfectly clear to me that *employees* are granted the right to belong to a union or not to belong to a union. If the employees elect to belong to a union and through such membership engage in concerted activities (an economic strike in this instance) for the purpose of collective bargaining, I find no prohibition in

Section 7 to prevent a union from disciplining those members who decline to honor an authorized strike.

It has never been disputed that a union may discipline its members for engaging in an unauthorized strike. I fail to see any congressional purpose to distinguish between wildcat strikers and strikebreakers. The activities of each are equally abhorrent to the establishment and maintenance of industrial peace through the orderly processes of collective bargaining.

In this case, membership in the Union is voluntary and not compulsory. The applicable union contracts with Allis-Chalmers incorporate union security clauses. These do not compel union membership as such but only require an employee to become and remain "a member of the Union to the extent of paying his monthly dues * * *." This limitation on union security clauses was declared by our court in Union Starch & Refining Co. v. National Labor Rel. Bd., 7 Cir., 186 F.2d 1008, 27 A.L.R.2d 629 (1951), cert. den. 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951), and remains unimpaired today.

Here, the strikebreaking employees had a choice. They could reject full union membership and merely pay their monthly dues, and thus remain outside and beyond the reach of union discipline. They chose, however, to associate themselves with others in full union membership. Thereby, they elected to receive all the benefits of full membership through the medium of collective bargaining. It necessarily follows that they incurred an ensuing obligation of union solidarity with respect to concerted work refusal. A member's obligations to his union as the reciprocal counterpart of his rights within the organization has been the

---

3. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 29 U.S. C.A. § 157.

subject of much writing[4] and need not be further extended here. See Parks v. International Brotherhood of Electrical Wkrs., 4 Cir., 314 F.2d 886 (1963), cert. den. 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed. 2d 142 (1963).

Section 7 of the Act safeguards an employee's right to strike and his right to refrain from striking. However, such rights are far from absolute rights. The Supreme Court has held that the right to strike falls in the face of a union's consent to a "no strike" clause in its labor agreement. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939). An employee union member may not exercise his right to strike contrary to an internal union regulation prohibiting membership strikes unauthorized by the union. Parks v. International Brotherhood of Electrical Wkrs., supra. The Supreme Court recently held that an employer's right to "the use of a temporary layoff of employees [lockout] solely as a means to bring economic pressure to bear in support of the employer's bargaining position, after an impasse has been reached" is not "in any way inconsistent with the right to bargain collectively or with the right to strike" as granted by Section 7 of the Act. American Ship Bldg. v. National Labor Relations Board, 380 U.S. 300, 308, 310, 85 S.Ct. 955, 962, 963, 13 L.Ed.2d 855 (1965).

The underlying statutory authority of bargaining representatives to represent all the members of an appropriate unit is derived from Sections 7 and 9(a)[5] of the Act and it must be allowed a "wide range of reasonableness" in serving the unit it represents without expecting to satisfy all who are represented. Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

The First Circuit in N. L. R. B. v. International Union, United A., A. & A. I. Wkrs., 320 F.2d 12 (1 Cir., 1963), considered the amenability of union members to internal union regulations in light of Section 7 and Section 8(b) (1) (A) of the Act. It concluded on pages 15–16:

"Under Section 7, absent a collective bargaining agreement to the contrary, the employee has indeed the unfettered right to abstain from indulging in union activity. He need not 'form,' 'join' or 'assist' a labor organization and, again, an agreement apart, this inactivity cannot be the source of recriminations. It is by now too clear for citation that this facet of Section 7 was designed to prevent forcing the unwilling worker into a union.

"However, we believe that it is quite another thing when the employee eschews his 'reluctance' and voluntarily joins a labor organization. At this point, under our view, the employee takes off the protective mantle of Section 7's 'refraining' provision and renders himself amenable to the reasonable internal regulations of the organization with which he chooses to cast his lot.

\* \* \*

"\* \* \* It is true that under Section 7 of the Act, and in the light of the limited security agreement which obtained between the Company and the Union in the instant case, the subject employees need not have joined the Union. However, once they voluntarily took that step, they embraced not only the benefits but also the burdens which flowed from their union membership. One of those 'burdens' was the duty of comporting with the Union's reasonable

---

4. Cox, Internal Affairs of Labor Unions, 58 Mich.L.Rev. 819 (1960); Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049 (1951); Gregory, Labor and the Law p. 106.

5. "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment \* \* \*." 29 U.S.C.A. § 159(a).

internal regulations; a requirement they failed to discharge here."

I would conclude, therefore, that Congress in the 1947 amendments to the Act, aside from barring a union from attempting to enforce its internal regulations by affecting the members' employment status, refrained from exploring the area of internal union affairs. It did not interfere with nor prohibit the right of the union to discipline its members for the violation of reasonable rules or policies it could legitimately expect its members to observe.

This conclusion is buttressed by the enactment of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U.S.C.A. § 401, et seq. The proviso added to Section 101(a) (2) reads: "Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

Further, Section 101(a) (5) recognizes the right of a union to discipline by fine, suspension and expulsion and provides certain procedural safeguards for the offending member.

The explicit provisions of this 1959 legislation are in harmony with the rationale I have attributed to the 1947 enactments.

Now, a few words about the strikes involved in this case. The first strike occurred in 1959. Of approximately 7400 bargaining unit employees, 175 union members elected to disregard the strike and work. The union warned the strikebreakers they were subject to a fine of as much as $100 for each day they worked during the strike. The strike continued for 54 working days and the dissidents remained at work. Subsequently, the offenders were fined, but no fine was more than a total of $100.

The second and third strikes occurred in 1962 and each lasted less than a week.

Members who refused to strike and elected to work were fined in amounts up to $100 each.

I can only conclude that the fines instituted by the Union against its dissident members for strikebreaking in this case do not represent the type of restraint or coercion proscribed as an unfair labor practice in Section 8(b) (1) (A) of the Act. My reading of the legislative history, cited authorities and the comprehensive regulatory provisions of the Landrum-Griffin Act of 1959, supra, makes clear to me that Congress was not addressing its proscription to intra-union regulation but rather to coercive acts of violence, intimidation or job discrimination.

In National Labor Rel. Bd. v. Amalgamated Local 286, Etc., 7 Cir., 222 F.2d 95, 97-98 (1955), we held that the action of a union in threatening to withhold certain insurance coverage from members because they had refused to pay certain *disciplinary assessments and fines imposed on them by the union* was not a violation of Section 8(b) (1) (A) of the Act, and was in full conformity with the union's right to regulate its internal affairs. See also, American Newspaper Pub. Ass'n. v. National Labor Rel. Bd., 7 Cir., 193 F.2d 782, 800 (1951).

Finally, the majority accepts the view of Allis-Chalmers that the opinion under review here is in conflict with our prior holding in Allen Bradley Company v. N. L. R. B., 7 Cir., 286 F.2d 442, 446 (1961). I do not agree.

The only question for decision in *Allen Bradley* was whether a contract provision under which the union agreed to waive its right to fine its members for exercising their statutory rights was within the area of mandatory bargaining under the Act. The court held that it was, and that the employer did not violate Section 8(a) (5) of the Act by insisting upon such clause in its negotiations with the union. The question here is whether a union violates Section 8(b) (1) (A) of the Act by imposing such a fine. We see no inconsistency in the holdings in the two cases. Any gratuitous statements in

286 F.2d at page 446 must be considered as dicta and not controlling here. If they are not to be considered as dicta and are controlling here, this being a re-hearing *en banc,* I would reject such statements, but not the decision in *Allen Bradley.*

I finally conclude that the imposition of the fines in question are not only free from proscribed restraint and coercion but are within the protected area of permissible internal union regulation.

In conclusion, to say that this court has bent a sympathetic ear to the frequent claims of employers to be kept secure from restraint or interference in their right to manage their own affairs, as a proper prerogative of management, re-quires no citation of authorities. I have joined in the recognition of such right claimed by employers.

That same concern for freedom of management to regulate the internal af-fairs of its own business, in all fairness, dictates my view that unions should have the same freedom of internal control. And, contrary to the insistent claims of Allis-Chalmers, I can only conclude that any other disposition of this case than indicated herein would be contrary to law and would adversely affect the orderly establishment and maintenance of good management-labor relations.

For the foregoing reasons, I would af-firm the result reached by the division of this court in its judgment rendered on September 13, 1965.

KILEY, Circuit Judge (dissenting).

I respectfully dissent. The court's opinion footnotes the facts and abbre-viates the points made in support of the original opinion, now withdrawn. I think it prudent to adopt, as part of my dissent, so much of the original opinion * as is necessary to give a full understand-ing of the points originally made:

\* \* \* \* \* \*

Allis-Chalmers contends that a union member who crosses a picket line of his own union is exercising his Section 7 right to refrain from engaging in a concerted activity and that if the un-ion disciplines the member for engag-ing in this activity by any means other than expulsion from the union, it vio-lates Section 8(b) (1) (A). This con-tention rests upon a literal reading of Section 7. But a literal reading fails to take into account the history and purpose of the Section, which shows that it was not intended to im-munize a union member from discipline for defiance of a decision of the ma-jority to strike.

There is no merit in the contention, because Congress did not intend in Section 7 to protect everything which might be described as "concerted activ-ities." As an example, the House Com-mittee Report on H.R. 3020, the House version of the bill, pointed out that the courts and the Board had already held that wildcat and sitdown strikes were not protected activities and that the bill would make no change in those rules;[1] and the Conference Report on the House and Senate bills states that Section 7 was limited to "protected ac-tivities," even though some unpro-tected activities may be "concerted" and within the literal meaning of the Section.[2]

Prior to the 1947 Taft-Hartley amendments no federal legislation in any way regulated union internal af-fairs or activities. Neither the orig-inal proposals of the House or Senate specifically prohibited a union from fining its members for "strikebreak-ing," although the original House ver-sion provided a number of restrictions on unions in their dealings with

---

\* Allis-Chalmers Mfg. Co. v. NLRB, No. 14853, 7th Cir., Sept. 13, 1965, at 3-9. Footnotes have been renumbered from the "slipsheet" opinion.

1. L.H. 318-19. (References to "L.H." are to the Legislative History of the La-

bor Management Relations Act, 1947, published by the National Labor Relations Board (1948).

2. L.H. 542-543.

members.[3] These provisions do not appear in the bill as enacted.

When Congress was considering the 1947 amendments, it was well aware of union disciplinary measures, including fines, for such activities as "strikebreaking." If Congress had intended to prohibit such fines—while at the same time permitting expulsion as a disciplinary measure—the intention to do so could be expected to be clear. See International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 620, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958). The indications, however, are to the contrary.[4]

The legislative history of Section 8 (b) (1) (A) shows also that the prohibition of that Section, with or without the proviso, was directed against the specific evils of force, violence, and threats thereof, mass picketing, and economic reprisals in the form of inducing an employer to discriminate against an employee in his job rights. It was not intended to have the breadth contended for by Allis-Chalmers and to encompass any activity, including fines collectible by legal process, which may be described as "coercive."

Section 12 of the version of the bill passed by the House defined a number of "unlawful concerted activities" by unions which could be enjoined or be the basis of a suit for damages. This provision was not enacted in the final version which became law. The Conference Committee Report[5] explains that Section 8(b) (1) (A) was intended to cover the activities specified in Section 12(a) (1)[6] of the House bill. That Section made no mention of fines as discipline for "strikebreaking."

House Report No. 245 on the House bill as reported by the Committee also made no reference to fines for "strikebreaking" in a listing of results to be achieved by the bill. It states, rather, that "It [the bill] outlaws mass picketing and other forms of violence designed to prevent individuals from entering or leaving a place of employment."[7] In the same report the Committee said, in explaining Section 8(b) (1):

> This is new, making it an unfair labor practice for labor organizations, their officers, agents, and representatives, or for employees, to interfere with, restrain or coerce employees. There is included in this provision a qualification which is not found in the corresponding paragraph covering employers—namely, that the interference proscribed is interference by intimidation.[8]

The language of the Section referred to was:

> (1) by intimidating practices, to interfere with the exercise by employees of rights guaranteed in Sec-

---

3. L.H. 52–56.

4. L.H. 1097, 93 Cong.Rec. 4318 (1947) (remarks of Senator Taft):
"The pending measure does not propose any limitation with respect to the internal affairs of unions. They still will be able to fire any members they wish to fire, and they still will be able to try any of their members. All that they will not be able to do, after the enactment of this bill, is this: If they fire a member for some reason other than nonpayment of dues they cannot make his employer discharge him from his job and throw him out of work. That is the only result of the provision under discussion."

5. L.H. 546.

6. L.H. 204.
"Sec. 12. (a) The following activities, when affecting commerce, shall be unlawful concerted activities:
"(1) By the use of force or violence or threats thereof, preventing or attempting to prevent any individual from quitting or continuing in the employment of, or from accepting or refusing employment by, any employer; or by the use of force, violence, physical obstruction, or threats thereof, preventing or attempting to prevent any individual from freely going from any place and entering upon an employer's premises, or from freely leaving an employer's premises and going to any other place. * * *"

7. L.H. 297.

8. L.H. 321.

tion 7(a) or to compel or seek to compel any individual to become or remain a member of any labor organization.[9]

The Supreme Court in NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, Int. Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Curtis Bros.), 362 U.S. 274, 286–87, 80 S.Ct. 706, 713, 714, 4 L.Ed.2d 710] (1960), stated that the Congressional debate shows that the purpose of Section 8(b) (1) (A) is "the elimination of the use of repressive tactics bordering on violence or involving particularized threats of economic reprisal" and that "[t]he note repeatedly sounded is as to the necessity for protecting individual workers from union organizational tactics tinged with violence, duress or reprisal." A fine collectible by legal process hardly comports with the notion of "reprisal" or "intimidation." The "economic reprisal" referred to is such things as securing discharge or reductions in pay or seniority.

The Board also has reached this conclusion with respect to the history of Section 8(b) (1) (A) in holding, in Local 283, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW-AFL-CIO (Wisconsin Motors Corp.), 145 NLRB 1097 (1964), that fines imposed on members and attempted to be collected in State courts for exceeding production quotas do not constitute restraint or coercion within the meaning of that Section. And in Minneapolis Star and Tribune Co., 109 NLRB 727 (1954) the Board held that a $500 fine for failure to attend union meetings and picket during a strike did not violate Section 8(b) (1) (A). The Board said there that a fine may be coercive but it is not what Congress meant by "coercion."

There are other considerations adding rational support for our conclusion. A union member may express agreement or disagreement with union rules or policies, but he cannot simultaneously be a member and also have whatever advantages there might be in non-membership, and he should not be immunized against discipline if as a member he acts against a lawful union activity determined by the majority to be in his, as well as their, interest. "The power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent. * * *" Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049 (1951).

A union is a form of industrial government and the rights and duties of a member are, similar to those of a citizen in a democratic society. Summers, p. 1074. The nature of this relationship was recognized by Congress in enacting Section 101(a) (2), 73 Stat. 522, 29 U.S.C. § 411(a) (2), of the LMRDA in 1959. In this section of the "bill of rights" of union members, after providing that members shall have the right to meet together and express their views on matters concerning the organization, Congress added the proviso

> That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal and contractual obligations.

Congress would have been inconsistent in adopting this proviso if it had previously, in Section 8(b) (1) (A), forbidden unions to fine members who cross picket lines, for what greater responsibility could a union member have to the union as an institution than to support a lawful strike called by the majority?

Allis-Chalmers' admission of the union's right under the Act to expel

---

9. L.H. 178–79. This was § 8(b) (1) of H.R. 3020, as it passed the House.

members for "strikebreaking" and its challenge of the lesser disciplinary power to fine is inconsistent. If it were true that a union's disciplinary power is limited to expulsion, this would mean that a union would be faced with the dilemma of either permitting anarchy and dissension within its ranks or depleting its strength by expulsion of the offending members. We have not been persuaded by Allis-Chalmers that this absurdity was in the contemplation of Congress.

The employer argues that a fine is not a lesser penalty, but is more coercive than expulsion, since many members would not object to, and might even welcome, expulsion. In many cases, however, expulsion could result in serious financial loss through cancellation of union insurance, pension and other benefits. It would be strange for Congress to prohibit one form of discipline and not the other, where the effect of the one permitted could be equal to, or greater, in severity than the one prohibited.

The employees in this case had the right, under Section 7, to strike or not to strike. But once the union voted to strike, the employees who were union members were bound by the limitation that union membership placed on their right not to strike. It would be difficult to accept the proposition that a union should be the one secular society in our nation which one may enter without being bound by majority rule and without submission to some limitations on rights for the common good. Upon entering, union members must take not only the benefits but the burdens also, N. L. R. B. v. International Union UAW–AFL–CIO, 320 F.2d 12, 16 (1st Cir. 1963), and these burdens are not solely financial. Implicit in the Section 7 right to organize is the duty, once that right has been exercised, to support the organization. The point is not that an employee, as such, may not refrain from striking, but that a union member may not with impunity flout the will of the majority (in this case a two-thirds majority) expressed in a strike vote.

If the employer's position that a union may not fine "strikebreakers" is correct, then the converse—that a union may not fine wildcat strikers— would also be true. This would render a union virtually powerless to enforce a no-strike clause on its members. The last portion of the proviso to Section 101(a) (2) of the LMRDA quoted above, however, clearly protects the rights of a union reasonably to discipline members who violate contract clauses. We do not think Congress intended to treat "strikebreakers" differently from wildcat strikers, so far as union discipline is concerned.

We disagree with the employer that this court's decision in Allen Bradley Co. v. N. L. R. B., 286 F.2d 442 (7th Cir. 1961), controls our disposition of the issue in this case. There this court held that proposals of the employer to limit the union's right to fine or discipline members refusing to join in a strike were subjects of mandatory bargaining. In dictum the court said that fines for crossing picket lines impose a sanction on the exercise of the right to work guaranteed by the Act and thus do not relate solely to the internal affairs of the union, so that the proviso of Section 8(b) (1) (A) was inapplicable to protect the union. We do not see how, if fining a union member for crossing a picket line is unlawful coercion, as Allis-Chalmers claims here, it can be a matter for collective bargaining. Nor can we see how, if the employer is "concerned" with a union's fining its members for crossing picket lines, so as to give the employer a bargainable interest in the matter—one of the principal bases of the *Allen Bradley* decision—it can be less "concerned" over the expulsion of members, which the employer here concedes is lawful.

The Board's decision in Local 138, International Union of Operating Engineers, AFL-CIO, 148 NLRB No. 74, holding it an unfair labor practice for

a union to fine a member for filing an unfair labor practice charge against the union, also does not militate against our position. That case was based on the principle that a union rule which seeks to frustrate the right of members to avail themselves of the services of the Board is contrary to recognized public policies and beyond the competence of a union to enforce by any coercive means.

\*   \*   \*   \*   \*   \*

Both the original and present opinions state the issue identically. I take the present holding of the court to be that "a union which imposes fines upon its members" for crossing a picket line, and seeks to collect the fines by suit or threat of suit, is guilty of an unfair labor practice in violation of § 8(b) (1) (A). On this holding, the original opinion to the contrary was withdrawn.

The original opinion discloses that both parties and the court were concerned only with fines imposed on union members who were subject to the union constitution and rules. This is clear from the original opinion, for example, "no members have been expelled or suspended from the union, nor have any resigned, for any reason arising from the disciplinary proceedings"; also "* * * the parties do not dispute * * * that the union may expel its members for any reason authorized by its rules"; and "Allis-Chalmers contends that a union member who crosses a picket line of his own union is exercising his Section 7 right * * *; and that if the union disciplines the member for * * * this * * * by any means other than expulsion, it violates Sec. 8(b) (1) (A)."

This being so, the court's statement concerning nonvoluntary members[10] might be misleading to the reader.

There is no question in the issue before us of "forced * * * membership."

An argument was introduced by Allis-Chalmers in its rehearing petition that the men before us were involuntary members having "solely a dues paying status," a "very limited technical" membership.[11] The union's answer to the petition stated that the union shop clause does not require full union membership; that the union could not compel employees to take the union oath, submitting to the union constitution and rule. The union's answer conceded that *if* the men before us had no obligation to the union beyond paying dues and fees, they would not be subject to the union "requirement of obedience to the common cause." [12] In reply Allis-Chalmers shifted gears: "This avoids the question in issue. The question is whether a union may coerce an employee who is a member, *be he one voluntarily or involuntarily*. It is the Petitioner's position that unions have no such right." [13] The question of involuntariness was not and is not in the case.

In addition, it seems important to me that a few observations be made about the court's opinion.

The opinion states:

> "In formulating our original opinion, we gave favorable consideration to the following arguments:
>
> \*   \*   \*   \*   \*   \*
>
> "6. An analogy was drawn between an industrial union and a democratic society where the majority rules, forgetting that a union is largely the creature of statute. * * *"

I am sure the court by the term "largely the creature of statute" meant only to say that the Wagner Act and subsequent legislation gave unions status as institutions. Taken literally the words im-

---

10. The court states, 358 F.2d at 660 "* * * where, as in the case before us, membership is the result not of individual voluntary choice but of the insertion of a union security provision in the contract under which a substantial minority of the employees may have been forced into membership."

11. Petition for Rehearing and For Rehearing En Banc, pp. 17–18.

12. Intervenor's Memorandum of Response to Petition for Rehearing, pp. 3–5.

13. Reply Brief for the Petitioner on Rehearing En Banc, p. 12. (Emphasis added.)

ply that unions, as associations of men, had no rightful prestatute existence. The Constitution presupposes and gives protection to the right of association. N.A.A.C.P. v. State of Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

The court states "the statutes in question present no ambiguities whatsoever, and therefore do not require recourse to legislative history for clarification." Section 8(b) (1) (A) is not less ambiguous than other parts of Section 8(b), application of which has been troublesome for the Supreme Court. For example, see N. L. R. B. v. Drivers Local Union, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960), and especially 362 U.S. at 290, 80 S.Ct. at 715, where the Court referred to the term "restrain or coerce" as "nonspecific, indeed vague, words. * * *" [14] And Allis-Chalmers, in its original brief in this case, relied upon legislative history to but[t]ress its contention as to the intent of Congress.

The stipulated facts do not warrant the court's implication that the actual fines imposed in this case took away the union member's "wages." There is no claim in this case that the fines levied were unreasonable. The only issue is with respect to the right to fine these union members for crossing a picket line and to enforce payment in court. And the original opinion cannot be read as insulating from Board or court decision the unreasonable imposition by a union of such fines as would be equivalent to preventing a member from working or blocking his promotion or having him demoted.

The court reassures the union, concerned if it has no right to fine members who are wildcat strikers, by noting that wildcat strikes are not protected activities and that the employer, by disciplinary action, will "adequately assist" the union. This burden would probably not rest lightly on the employer, nor will the reassurance put the union quite at ease about enforcement of no-strike clauses.

It is my view that the original opinion was correct, and I adhere to the views I expressed there. I would deny the petition to set aside the Board's dismissal of the complaint.

I also concur in the views expressed by Chief Judge Hastings and Judge Swygert in their separate dissents.

SWYGERT, Circuit Judge (dissenting).

I concur in both Chief Judge Hastings' dissent and Judge Kiley's dissent. I think, however, that additional comment is necessary to reemphasize what I conceive to be the erroneous premises upon which the majority opinion rests.

I do not disagree with the majority opinion's generalities about the laudable role of labor unions in our recent industrial history and the importance of protecting the American workingman from any suggestion of involuntary servitude. These generalities, however, are irrelevant and do not solve the legal question presented. The relevant points cited by the majority in support of its conclusion, and with which I disagree, are: (1) this case involves employees who are involuntary members of the union; (2) the possibility exists that the union might exact crippling and unreasonable fines; and (3) there is no occasion for resorting to legislative history in the application of sections 7 and 8(b) (1) (A) of the National Labor Relations Act to the facts of this case.

There is no issue in this case concerning compulsory union membership. The issue is whether an employee who has voluntarily applied for and been admitted to full union membership may be subjected to a disciplinary fine for crossing a picket line established by his union. The majority's reliance upon co-

---

14. The Fifth Circuit, rejecting a district court's dictionary interpretation of the word "coerce" in § 8(b) (4), had recourse to legislative history, stating: "We believe that the Congress used 'coerce' in the section under consideration as a word of art * * *." Local Union No. 48, of Sheet Metal Workers v. Hardy Corp., 332 F.2d 682, 686 (5th Cir. 1964).

erced membership is misplaced. Both the Board and the union concede that an employee, even though required by a union security clause to tender uniform initiation fees and periodic dues in order to hold his job, is not subject to internal union discipline if he has either rejected full union membership or resigned from the union.

There is no issue in this case relating to "consecutive fines [which] may run into thousands of dollars." The facts show that the fines imposed ranged from $20 to $100. This court should not consider hypothetical questions. Reliance upon speculative union conduct and the burdens it might impose upon a recalcitrant member is n&t justifiable. Moreover, a member who has been fined and believes that the fine is excessive may contest the fine either in a state court action brought to collect it or in a federal court action claiming a violation of his rights under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401–531 (1959).

A literal construction of sections 7 and 8(b) (1) (A) is neither permissible nor dispositive of the issue in this case. It is axiomatic that in interpreting statutes a court must ascertain and give effect to the legislative intent. The words actually chosen are, of course, the strongest measure of the legislative purpose. But words generally have different shades of meaning, and the dominant meaning— the one the legislative body intended— can often be ascertained only by considering the process out of which it evolved. For that reason we should not ignore the legislative history of such significant congressional expressions as sections 7 and 8(b) (1) (A). The briefs and arguments of the parties in this appeal were primarily devoted to the scope of application intended for these provisions by Congress. Refusing to admit that these sections contain words of art

whose meaning can only be discerned by consulting their legislative background or failing to recognize that these sections are but amendments to the NLRA and that they should be considered within its contextual framework is inconsistent with proper statutory interpretation. The majority opinion implicitly recognizes this when it refers to the "extensive Congressional debate and study" which assertedly reduced the interpretation of section 8(b) (1) (A) to a simple exercise. The Supreme Court has not found a literal reading of this provision so conclusive. In N. L. R. B. v. Drivers' Local Union 639, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960), the Court found it necessary to examine the legislative history of section 8(b) (1) (A) in detail in order to decide whether peaceful picketing by a union is conduct which might "restrain or coerce" employees in the exercise of section 7 rights and therefore falls within the prohibition of section 8(b) (1) (A).

Finally, I am not convinced that a mechanical application of the statutes in question provides an answer to the problem. Employees have the right to engage in concerted activities or to refrain from engaging in such activities. But to read section 7 as saying that an employee who is also a union member may make an independent, *ad hoc* determination to cross a union-imposed picket line without subjecting himself to reasonable internal union discipline is to say that an employee-member may simultaneously engage in protected activity and refrain from so engaging. If an employee wishes to be free of internal union discipline, there are no legal barriers against the exercise of such choice. But when an employee voluntarily joins a union (an exercise of his section 7 rights) he may not join on his own terms, abiding only by those rules with which he is in personal agreement.[1] Similarly, to read the proviso in

---

1. In N. L. R. B. v. International Union UAW, 320 F.2d 12, 15 (1st Cir. 1963), the First Circuit commented on the effect of union membership on an employee's section 7 right to refrain from concerted activities in the following manner:

Under Section 7, absent a collective bargaining agreement to the contrary, the employee has indeed the unfettered right to abstain from indulging in union activity. He need not "form," "join" or "assist" a labor organization and, again,

section 8(b) (1) (A) as limiting a union's internal disciplinary power to expulsion of its members seems to me to be not only an undue restriction of the words "retention of membership" but also an application of the proviso in a way not intended and in a manner which diminishes a power which would exist entirely apart from the proviso. Section 8(b) (1) (A) by its terms is directed at union conduct vis-à-vis employees, not at union conduct vis-à-vis union members.