242 F.2d 477
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BROTHERHOOD OF PAINTERS, DECORATORS and PAPERHANGERS OF
AMERICA, Carpet, Linoleum and Resilient Tile
Layers Local Union No. 419, AFL, and
George Cooney, its business
agent, Respondents.
 No. 5418.
 United States Court of Appeals Tenth Circuit.
 Feb. 26, 1957.
 
 Melvin Pollack, Washington, D.C. (Theophil C. Kammholz, Stephen Leonard, Marcel Mallet-Prevost and Owsley Vose, Washington, D.C., were on the brief), for petitioner.
 Philip Hornbein, Jr., Denver, Colo. (Hornbein & Hornbein and Roy O. Goldin, Denver, Colo., on the brief), for respondents.
 Before BRATTON, Chief Judge, and MURRAH and LEWIS, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 Petitioner, National Labor Relations Board,[1] seeks enforcement of a remedial order issued by the Board requiring the Brotherhood of Painters, Decorators and Paperhangers of America, Carpet, Linoleum and Resilient Tile Layers Local Union 419[2] and George Cooney, its business agent, to cease and desist from two unfair labor practices found by the board to have occurred in the union's relationship with Spoon Tile Company[3] and certain of the company's employees.[4] The order is based upon a finding that the union twice violated § 8(b)(2) and § 8(b)(1)(A) of the National Labor Relations Act as amended.[5]
 
 
 2
 In its decision the Board has set forth the factual background upon which it bases the determination that the union committed an initial unfair labor practice. The Board states:
 
 
 3
 'The pertinent circumstances as disclosed by the record are as follows:
 
 
 4
 'The Company, a partnership, began work in March 1954, as a subcontractor, installing wall and floor tile in a housing project near Denver. A partner, Spoon, contacted the Union's business agent, Cooney, a Respondent herein, and informed him that the Company needed men to install tile. Cooney assured Spoon that the Union would be able to furnish the men. Cooney also informed Spoon in a general manner what working conditions and wage scales the Union would require.
 
 
 5
 'A few days later, the Company's foreman at the housing project, Baker, telephoned Cooney and asked him for the Union's wage scales as well as for a sufficient number of men to man the job. Cooney told Baker that he would send him the necessary information and, shortly after that, Baker received 4 documents by mail.
 
 
 6
 'One of the documents, among other things, recited the prevailing wage scales for Union members in the Denver area and also incorporated by reference as part of the understanding between the parties the standard contract that the Union formerly executed with employers in the Denver area prior to 1948.[6] The latter contains provisions which require the employer to hire only Union members or those obtaining a working permit from the Union. The standard contract was one of the four documents received by the foreman, Baker.
 
 
 7
 'On the document containing the wage scales, the Union's business representative, Cooney, had written the following sentences. 'We have not required a signed agreement since 1947. However, we conform to the old agreement insofar as it does not conflict with any State or Federal laws.'
 
 
 8
 '* * * Apart from 3 employees, all the tile installing men employed by the Company at the housing project were Union members who had been secured through the Union. As to 2 of the three employees, a partner, Oshier, credibly testified that, although he had contacted them on his own, he had then notified the business agent about the men. Oshier stated that 'I told (Cooney) that we had these two men and if he would clear them through we would like to put them to work.' The Third employee, Carls, had gone to work for the Company at the housing project after receiving a working permit from another union with whom the Company had contractual relations. About two days later, the latter union and the Respondent Union became involved in a jurisdictional dispute as to which union had the right to install the wall tile at the project. As the Respondent Union's members had been assigned this work at the commencement of the housing project, it was agreed that they should continue to perform this work until the international union with which both unions were affiliated should resolve the jurisdictional dispute. Carls was assigned to installing wall tile. Carls credibly testified that Cooney decided to give him a working permit until it was determined which union was to perform the work. Later, Cooney induced Carls to apply for membership in the Respondent Union.'
 
 
 9
 Upon the recited facts the Board specifically refused to find that the union had entered into a closed shop contract[7] but did find, contrary to the recommendation of the trial examiner, that it had enforced illegal hiring practices at the company's project.
 
 
 10
 In substance the National Labor Relations Act makes it an unfair labor practice for a labor organization to cause or attempt to cause an employer to discriminate against an employee in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. 29 U.S.C.A. 158(b)(1)(A), 158(b)(2), 158(a)(3). It is apparent therefore that a labor organization does not commit an unfair labor practice unless (a) the employer by discrimination in regard to hire, tenure of employment, or terms or conditions of employment encourages or discourages union membership and (b) the union causes or attempts to cause the employer to so discriminate.
 
 
 11
 No complaint has been leveled against Spoon Tile relative to the questioned hiring practice and as a consequence we are not called upon, as we view the posture of the case, to specifically determine whether that company's hiring practice was unlawful. Assuming without deciding that the company was violative of the Act, the record remains barren of indicia that the company's actions were based upon a tacit understanding with the union. There is no evidence that the union ever negotiated with the employer to channel job applicants through the union.[8] The facts relied on by the Board, if sufficient to show an illegal hiring practice, show only that such a practice existed as a unilateral policy of the employer with nothing more than passive acquiescence upon the part of the union. Neither employer nor union can be held accountable for the unilateral actions of the other. Neither is bound to police the other nor can it be inferred that an unfair labor practice indulged in by one is caused by the undisclosed activity of the other or through the tacit understanding of both. Evidence of such activity or understanding is necessary. Del E. Webb Const. Co. v. N.L.R.B., supra. We find nothing in this record to indicate that Spoon Tile was not free to employ non-union men at the jobsite or to discontinue, at its pleasure, the use of the union's facilities for procuring workmen. We conclude that the evidence is insufficient to sustain the Board's finding that the Union enforced an illegal hiring practice under these circumstances.
 
 
 12
 The Board has also found the union and its agent to have committed an unfair labor practice by their participation in events effectuating the discharge of four company employees, complainants herein, on October 15, 1954. Upon this review, the union admits that its active insistence occasioned the company's action in discharging the men but contends that a company practice of payment for 'piecework' justified the union's coercive methods.
 
 
 13
 In May, 1954, Spoon Tile adopted the policy[9] whereby it gave its tile setters an extra hour's pay each day for the completion of a work quota. No set number of hours was required as a condition of amount of wages. When an employee finished a designated amount of work he was free to and did go home. Quality of work was not considered although some was admittedly substandard. Believing this method of payment to constitute work paid for at a rate based on the amount done rather than on time employed, the union forbade its members to engage in it. Thereafter the company ceased to pay the extra moneys weekly and paid it on a monthly basis in order to keep knowledge of it from the union. In September the union found out that the practice was continuing and, after calling an executive board meeting, took action ad indicated by the minutes of the meeting:
 
 
 14
 'October 9, 1954, Spoon Tile case-- Reported that of the ten men who were regularly employed, seven failed to comply with the Board's request for them to report irregularities, such as leaving the job early, inferior workmanship and accepting bonus payment. George (Cooney) was given instructions to eliminate these conditions on the job in whatever way possible in order to prevent these conditions from spreading to other shops. The employees of Spoon were admitted to the Board meeting. Several denied the charges of pieceworking and charged the Board with attempting only to limit their wages. The chairman of the Board then advised these employees that they would all be referred to other jobs, with the exception of Fred Deicken, Cooke Smith and Leonard Berkheimer. These men were told to report any further violations of the agreement on the job immediately and are (sic) agreed to report if any further bonus pay was offered.' (Emphasis added.)
 
 
 15
 Of the seven men pulled from the Spoon Tile Project the four complainants herein refused to submit to the direction of the union and reported for work at the project. The union threatened to picket the job if the claimants worked and thereupon they were discharged by the company.
 
 
 16
 We are of the opinion that the action of the union clearly violates the Act as charged. Prior to 1954, there was some confusion among the courts as to the quantum of proof required to show that the effect of the discharge by an employer was to encourage or discourage union membership. The consideration of Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, at that time consolidated three factual situations, two of which are comparable to the instant case, in that the union member's employment rights were affected by his relationship with the union. The rule is clear: When the insulation of the act between the rights of employment and organization is pierced by the employer or union for the enforcement of union rules, valid union security provisos excepted, no direct evidence of specific intent to encourage membership in a labor organization is required. The natural consequence of such on-the-job discrimination is to strengthen the union control.
 
 
 17
 Although the union may prescribe reasonable rules for membership and its retention, the Act prohibits the enforcement of such rules by the use of employment as a tool of discrimination, as here. N.L.R.B. v. Local 1423, United Brotherhood of Carpenters, Etc., 5 Cir., 238 F.2d 832. Each employee has the right to participate in union activities to the extent and only to the extent the employee desires without jeopardizing his employment. Consequently, although the union's action in insisting upon the discharge of claimants may have been motivated by a desire to prevent certain conditions (piecework) at the Spoon Tile project from spreading throughout the industry and endangering advantages won through organization, it cannot use methods of accomplishment which ignore the rights of the individual employees under the Act. The foreseeable consequence of effectuating complainants' discharge was to encourage union membership and adherence to union rules in direct contravention of §§ 8(b)(2) and 8(b)(1)(A) of the Act. Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., supra.
 
 
 18
 The order of the Board, modified in accord with the view herein expressed, will be enforced.
 
 
 
 [1]
 Hereinafter called the Board
 
 
 [2]
 Hereinafter called the union
 
 
 [3]
 Hereinafter called the company
 
 
 [4]
 The Board's order includes make-whole provisions for the benefit of these employees
 
 
 [5]
 61 Stat. 136, 29 U.S.C.A. § 151 et seq
 
 
 [6]
 'The following 2 paragraphs are in the document containing the wage scales:
 For the purpose of uniformity and for your information, I (Cooney) have been asked to send a copy of the 1950 memo, which supplemented our working agreement to all Employers.
 This memo will serve as a reference, in conjunction with our old agreement for your convenience. The record shows that the indicated previous working agreement was the standard contract mentioned above.'
 
 
 [7]
 The Board did not base its refusal in this regard upon the existence of a saving clause in the agreement sent to Spoon Tile. Red Star Express Lines of Auburn v. N.L.R.B., 2 Cir., 196 F.2d 78; N.L.R.B. v. Gaynor News Co., 2 Cir., 197 F.2d 719; N.L.R.B. v. E. F. Schuck Const. Co., 9 Cir., 1957, 243 F.2d 519. But see also N.L.R.B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832
 
 
 [8]
 The employer specifically testified that the subject of the hiring practice of Spoon Tile had never been discussed by the company and the union and that no agreement of any kind existed relative to the hiring. The testimony was apparently discredited by the Board but may by considered by us. Del E. Webb Const. Co. v. N.L.R.B., 8 Cir., 196 F.2d 841, 38 A.L.R.2d 402
 
 
 [9]
 There is no support in the record for the contention advanced by the union that Spoon Tile bargained separately with the employees. The Board is well supported in its conclusion that the method of payment was unilaterally established by Spoon Tile