**Russell SCOFIELD, Lawrence Hansen, Emil Stepanec, and George Kozbiel, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14698.

United States Court of Appeals Seventh Circuit.

March 5, 1968.

Knoch, Senior Circuit Judge, dissented.

James Urdan, John Q. Kamps, Quarles, Herriott & Clemons, Milwaukee, Wis., for petitioners.

Joseph L. Rauh, Jr., John Silard, Harriett R. Taylor, Stephen I. Schlossberg, Washington, D. C., Harold A. Katz, Irving M. Friedman, Chicago, Ill., Philip L. Padden, Milwaukee, Wis., for amicus curiae.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., for respondent.

Before KNOCH, Senior Circuit Judge, and SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioners, four employees of Wisconsin Motor Corporation ("the Company"), ask us to set aside an order of the National Labor Relations Board dismissing an unfair labor practice complaint that had issued upon their charges against their Union.[1]

Petitioners are members of a Union that has been the bargaining representative of the production employees of the Company since 1937. The collective bargaining contract requires such employees to belong to the Union or to pay it a service fee equivalent to dues. The Company is based in West Allis, Wisconsin, where it manufactures motors. Half of its 850 production employees, including these petitioners, are compensated on a basis permitting them to earn amounts above their basic hourly wages by producing at a rate in excess of established hourly norms of output.

In 1944, the Union membership adopted a resolution providing in substance that "the men turn in [report for payment] no more than 10 cents per hour over and above the new machine rates." In 1946, the membership approved fines as penalties for violation of that ceiling rule. The penalties are presently contained in a February 1961 Union by-law which provides that any member violating the production ceilings is "guilty of conduct unbecoming a Union member" and subject to a fine of $1.00 for each violation. The by-law also provides that in case of persistent ceiling violations, the offender would be charged with "conduct unbecoming a Union member." If a member were found guilty of such conduct, he could be assessed with a maximum fine of $100 (enforceable within a specified time by automatic suspension or expulsion) or suspended or expelled from membership. The Union's sanctions do not impair a member's status as an employee of the Company.

Ceilings were established from time to time through collective bargaining between the Company and the Union although the Company did not agree to limit wages accordingly. Thus if an employee produced work in excess of the ceilings, the Company would on request pay him for his actual production without regard to the ceilings. So far the Company has been unsuccessful in its bargaining for the elimination of the Union ceiling rates, but the ceilings on all piecework jobs were increased in July of 1953 and August 1956. The ceilings in effect at the time of this dispute were between 45 and 50 cents above the machine rates.

By Union rule, any production which a production employee member has turned out at a pace which would yield hourly rates above the ceiling rates is not to be reported to the Company for immediate compensation. Instead, such members are required to "bank" with the Company their earnings in excess of ceilings. On occasions when they receive less than ceilings (for example, through absence or enforced idleness), the Union permits the members to draw upon their "bank" by charging the Company for work previously produced but not reported for wage purposes. Although the Company normally acquiesces in the "banking" system, if an employee chooses to disregard the Union rule and report all production for im-

1. Local 283, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW-AFL-CIO. The parent Union is an intervenor.

mediate payment, the Company, as noted, will pay him even though the Union ceilings are exceeded.

In 1946, the Union first began enforcing its "banking" system by imposing fines. In 1961, the Union found that six members had violated the "banking" system by reporting to the Company for immediate payment production at a rate in excess of the Union ceilings. Two members were fined $35 each and paid their fines. Two of the petitioner members were fined $100 each, the third was fined $75, and the fourth was fined $50. Instead of paying their fines, the four petitioners filed unfair labor practice charges with the Regional Director of the National Labor Relations Board in May 1961. In October 1961, the Union filed a suit to collect the fines in the Civil Court of Milwaukee County, Wisconsin, where it is still pending. In December 1961, the General Counsel of the Board issued a complaint charging that the Union, in fining and suing petitioners, had restrained and coerced them in the exercise of their rights under Section 7 of the National Labor Relations Act [2] and thereby violated Section 8(b) (1) (A) [3] of the Act. The Union and Company have taken no measures to impair the job status of the petitioners.

The Trial Examiner and the Board concluded that Section 8(b) (1) (A) had not been violated and dismissed the complaint. In view of the authoritative construction of that Section in National Labor Relations Board v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, we must deny the employees' petition for review.

As early as 1951, this Court construed the proviso in Section 8(b) (1) (A) in American Newspaper Publishers Association v. National Labor Relations Board, 193 F.2d 782 (7th Cir. 1951), affirmed on other grounds, 345 U.S. 100, 73 S.Ct. 552. There the union threatened to expel members for violation of a rule forbidding them to work in a shop with non-members. Even though the expulsion might involve the loss by the employee of his job and other economic benefits such as pension and mortuary provisions, we held (at pp. 800–801, 806):

"Under this limitation [proviso] Congress left labor organizations free to adopt any rules they desired governing membership in their organizations. Members could be expelled for any reason and in any manner prescribed by the organization's rules, so far as § 8(b) (1) (A) is concerned. This interpretation has support in the legislative history of the Act. It is also significant that while the Board has been so interpreting this section of the Act during the past four years, Congress has not amended the section to indicate that a broader interpretation of the section was intended or desired. It is not within the power of the courts to write into this section of the Act, by interpretation, language which would broaden its scope.

\* \* \* \* \* \*

" \* \* \* the proviso in § 8(b) (1) (A) permits unions to enforce their internal policies upon their membership as they see fit."

In National Labor Relations Board v. Amalgamated Local 286, 222 F.2d 95

---

2. Section 7 grants employees the right to refrain from concerted activities. It provides in pertinent part (29 U.S.C. § 157):

"Employees shall have the right to \* \* \* engage in \* \* \* concerted activities \* \* \*, and shall also have the right to refrain from any or all of such activities \* \* \*."

3. Section 8(b) (1) (A) provides in pertinent part (29 U.S.C. § 158(b) (1) (A)):

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein \* \* \*."

(7th Cir. 1955), the union threatened to deprive certain members of group and hospitalization insurance coverage because they had refused to pay various disciplinary assessments and fines which the Union had imposed upon them. Following the lead of *American Newspaper Publishers Association,* the Court held that under the proviso in Section 8(b) (1) (A) the union's threatened withdrawal of the insurance rights of the complaining employees as a disciplinary measure was in full conformity with its right to regulate its internal affairs.

■ Thus in this Circuit, even before the decision in National Labor Relations Board v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, great breadth was accorded to the proviso in Section 8(b) (1) (A). In *Allis-Chalmers,* the opinion of the Court holds that the words "restrain or coerce" used in Section 8(b) (1), as shown by the legislative history of the Section, were not meant to encompass internal affairs of unions. In other words, internal union disciplines are not among the proscribed restraints. In reaching this conclusion, the Court was partly motivated by our national labor policy that clothes a union with powers analogous to a legislature, with union rules enacted by the majority becoming binding on the minority. The Court noted that in the case of a strong union, expulsion from membership is a far more severe penalty than a reasonable fine (at p. 183, 87 S.Ct. 2001)[4]. The Court's examination of the legislative history of Section 8(b) (1) (A) convinced it that the statute does not prohibit union imposition of disciplinary fines and suits to collect them. In reaching its conclusion that the body of Section 8(b) (1) (A) was inapplicable to fines and collection suits aimed at union members crossing picket lines and working during lawful strikes, the Court found cogent support in the proviso to Section 8(b) (1), stating (at pp. 191–192, 87 S.Ct. at p. 2012):

> "At the very least it can be said that the proviso preserves the rights of unions to impose fines, as a lesser penalty than expulsion, and to impose fines which carry the explicit or implicit threat of expulsion for nonpayment. Therefore, under the proviso the rule in the UAW constitution governing fines is valid and the fines themselves and expulsion for nonpayment would not be an unfair labor practice."

The Court found it unnecessary to decide whether Section 8(b) (1) (A) "proscribes arbitrary imposition of fines, or punishment for disobedience of a fiat of a union leader" (at p. 195, 87 S.Ct. at p. 2014).[5]

In his concurring opinion, Mr. Justice White relied more on the proviso to Section 8(b) (1) (A) than on legislative history showing the inapplicability of the "restrain or coerce" language of the body of the Section. In joining in the opinion of the Court, he noted that there might be some internal union rules "which on their face are wholly invalid and unenforceable" (at p. 198, 87 S.Ct. at p. 2016).

■■ Union opposition to piecework has a history in the labor union movement dating at least back to 1908.[6] Fines and expulsion of members for violating the present and antecedent ceilings have been the rule for 22 years. We are told that the work of a majority of these employees would be jeopardized by younger, more energetic employees, and that the rule is therefore intended to protect the well-being of all members, for if the younger employees received higher pay by increased production, the

4. See also Cox, "The Role of Law in Preserving Union Democracy," 72 Harv.L. Rev. 609, 612, 622–623 (1959).

5. It should be noted that the amounts of the instant fines are reasonable, so that there is no need to read Section 8

(b) (1) as barring court enforcement of them. We need not consider whether excessive fines would be proscribed by that Section.

6. See Slichter, Union Policies and Industrial Management (1941), pp. 285–286.

older members, unable to turn out similar piecework quantities, would be demoralized and even face lay-offs. As the Trial Examiner pointed out, ceiling rules derive from a legitimate, traditional interest in union objectives. They reflect fears of (1) employees working themselves out of jobs by overproduction; (2) the establishment of a new productive norm lowering the piecework rate and the compensation for actual production; (3) morale-threatening jealousies and (4) health problems caused by too much pressure. These factors were covered in some detail in the excerpts from various labor authorities appended to his report (145 NLRB at pp. 1138–1141). One such authority explained the purpose of ceiling limits as follows: [7]

> "At their *inception* the purpose of limits applying to pieceworkers is not primarily to make work but partly to protect the union from being weakened by jealousies and dissensions arising from the fact that some workers receive better jobs than others, partly to prevent foremen from playing favorites in assigning jobs, and partly to prevent employers from cutting liberal piece rates or from using the high earnings of some workers as an argument against a general increase in piece rates. Such limits have in the past been common among the glass bottle blowers, the flint glass workers, the potters, the stove molders, and in 1940 are being imposed by the leather workers in Massachusetts."

Thus the rule has a rational basis, and we cannot say that it was not reasonably calculated to achieve a permissible end. Accepting the *Allis-Chalmers* stricture that in considering questions of union discipline a union is comparable to a legislature, our function is to determine whether these fines conform to policies formulated by the Union and not violative of its constitution or of federal law.[8] Since the end here was a legiti-

mate union objective and the means were appropriate to enforce it, our hand should be stayed. McCulloch v. State of Maryland, 17 U.S. (4 Wheat.) 316, 420, 4 L. Ed.2d 579. Enough has been said to show that the Union's imposition of these fines was not arbitrary and that the rules themselves are grounded on a long-standing policy and cannot be deemed invalid or unenforceable on their face.

■ Petitioners argue that the present rule circumvents the bargaining process, and that the Union should have to obtain a provision against incentive pay through collective bargaining with the Company. Since petitioners concede that the Union can validly impose ceilings through collective bargaining, it is no great departure to allow them to be imposed by a disciplinary rule enforcing ceilings already established by collective bargaining. If a union has validly established a policy against overproduction, it must have the concomitant power to discipline members who violate ceilings. Cf. Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049 (1951). Discipline has been described by the same author as the criminal law of union government. "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L. J. 175, 178 (1960).

As the intervenor pointed out, the rule enforced in *Allis-Chalmers* was of more serious economic consequence to the employees, for they were not permitted to work during that strike and their jobs might be forfeited. Here the employees were permitted to work even in excess of ceilings, with the additional earnings deferred under the Union's "banking" system. Their job rights were unaffected by the rule. Petitioners assert that "banking" involves a very small amount of the Company's production and does not overcome the Union's limitation on production, but under Section 8(b) (1) (A) of the Act, as interpreted in *Allis-*

---

7. Slichter, op. cit., pp. 166–167; see also pp. 296–305.

8. Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049, 1073–1074 (1951).

*Chalmers*, the Union rule would survive even if there were no provision to "bank" excess earnings.

Petitioners depend principally on Allen Bradley Company v. National Labor Relations Board, 286 F.2d 442 (7th Cir. 1961). There the question was whether the union was obliged to bargain in good faith over a collective bargaining contract provision proposed by the employer limiting the union's right to discipline or fine its members. The holding was that the proposals made by the company were a proper subject for collective bargaining. The question for resolution by this Court was not whether union discipline of members violates Section 8(b) (1) (A). Furthermore, in that case, Judge Major stated (at p. 446):

> "Coercive action, whether by way of fine, discharge or otherwise, which deprives a member of his right to work and his employer of the benefit of his services, cannot be said to relate only to the internal affairs of the union."

In the present case, no member has been deprived of his right to work nor has the employer been deprived of the benefit of a member's services. To the extent that a dictum in *Allen Bradley* disapproves union fines and collection suits aimed at members crossing the union's picket line and continuing to work for their employer, that dictum was flatly rejected in *Allis-Chalmers* and is no longer viable. But as *Allen Bradley* still holds, the Wisconsin Motor Corporation can require the Union to bargain over a demand to give up its ceiling rule.

Petitioners rely on Printz Leather Co., Inc., 94 NLRB 1312 (1951), where the union threatened to strike if the employer did not discharge an employee who the union felt was working too fast. *Printz* is inapplicable because there the union's objective (unilateral imposition of production ceilings) and methods (threats to force the employer to discharge the employee) were manifestly improper. Associated Home Builders of Greater East Bay, Inc. v. National Labor Relations Board, 352 F.2d 745, 751–752 (9th Cir. 1965); National Labor Relations Board v. Brotherhood of Painters, 242 F. 2d 477, 480–481 (10th Cir. 1957). They also rely on Charles S. Skura, 148 NLRB 679, 683 (1964), which held that the union violated Section 8(b) (1) (A) by fining an employee-member for filing an unfair labor practice charge against the union without first exhausting internal union remedies.[9] The Board held that the union's objective was at odds with policy considerations because " 'no private organization should be permitted to restrict any person's access to courts of justice' ". No policy considerations of comparable strength militate against the Union rule here at issue.

The petition for review is denied.

KNOCH, Senior Circuit Judge (dissenting).

I think we are in error in concluding that Allis-Chalmers is dispositive of the case before us, and that there is a difference here only of degree and not of kind. The forceful dissent of the four Justices in Allis-Chalmers and the limited concurrence of Mr. Justice White seem to me to dictate a very cautious application of the principle of that case to other cases (such as this one) which involve no impairment of the collective bargaining power and its concomitant strike weapon. I fear that the majority have unduly extended the scope of Allis-Chalmers. In my opinion the coercive fines here imposed constituted an unfair labor practice, and the Board's dismissal of the complaint herein should be reversed.

9. This question is now awaiting argument in the Supreme Court in Industrial Union v. National Labor Relations Board, No. 796, present Term. No view is expressed herein as to the correctness of the Skura rule.