**U. O. P. NORPLEX, DIVISION OF UNIVERSAL OIL PRODUCTS COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18080.**

United States Court of Appeals, Seventh Circuit.

April 16, 1971.

Duffy, Senior Circuit Judge, concurred and filed an opinion.

Pell, Circuit Judge, dissented and filed an opinion.

Lionel J. Goulet, Des Plaines, Ill., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, J. L. A. de Passalacqua, Attys., National Labor Relations Board, for respondent.

Before DUFFY, Senior Circuit Judge, KILEY and PELL, Circuit Judges.

KILEY, Circuit Judge.

Petitioner, U. O. P. Norplex, Division of Universal Oil Products Company (Norplex), seeks to have reviewed and set aside an order of the National Labor Relations Board which found petitioner had violated Section 8(a) (5) and (1) of the National Labor Relations Act[1] by insisting to the point of impasse upon the Union's[2] withdrawal of fines previously imposed on member-employees of Nroplex who had crossed the picket line during an economic strike in violation of a Union rule. The Union seeks enforcement of the order. We deny the Norplex petition and enforce the order.

Norplex manufactures plastic parts for the automotive, electronic and other industries. The Union has been bargaining agent for employees of Norplex's predecessor and Norplex since it was certified after an election in 1958. The termination date of the last contract between Norplex and the Union was March 31, 1968. Efforts at negotiating a new contract failed, and the Union struck May 14, 1968. At that time 54 Union members of the 92 employee force

---

1. 29 U.S.C. § 158(a) (1), (5).

2. Lodge 1616 International Association of Machinists and Aerospace Workers, AFL-CIO.

in the bargaining unit joined the strike, but 13 Union members crossed the picket line and returned to work. Thereafter, the Union imposed fines on each of the 13, ranging from $300.00 to $500.00.

At the outset of the strike Norplex continued to operate with replacement of employees. On August 16, 1968, there were 98 employees doing bargaining unit work, 56 of them replacement employees. Norplex on that date refused to supply the Union with information requested by the Union for framing a proposal counter to one made by Norplex. After notice to the Union, Norplex petitioned for an election. The Union then filed a refusal to bargain charge. Subsequently, Norplex and the Union entered a settlement agreement under which Norplex agreed to "bargain collectively * * * by furnishing" the Union the information it requested which was necessary for bargaining as to "wages, hours, and other terms and conditions of employment."

We see no merit in the contention of Norplex that there is not substantial evidence in the record as a whole to support the finding that the Union represented a majority during the period of negotiation. The settlement agreement required Norplex to bargain with the Union, and following the settlement agreement Norplex continued to negotiate with the Union.

At a bargaining meeting on November 7, 1968, attended by a federal mediator, Norplex advised the mediator that any contract with the Union must include a provision that the Union would withdraw the fines imposed on members who crossed the picket line. The Union rejected such a provision. At a later meeting Norplex advised the Union committee that any contract must be predicated on the Union's withdrawal of the fines. The Union again rejected any such predicate on the ground that the

fines were internal affairs of the Union. After an impasse in the negotiations was reached, the Union filed charge of violation of 8(a) (5), and the proceeding before us followed.

I.

The question before us is whether Norplex's insistence to the point of impasse upon the withdrawal of the fines imposed upon the Union member-employees who crossed the picket line violated Section 8(a) (5) and (1).

In NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the Supreme Court held that an employer's insistence, as a condition precedent to the execution of a contract, that the union agree to a "ballot clause"—a clause which required polling of union members before calling a strike or refusing the employer's last offer—violated Section 8(a) (5) and (1) of the Act. The Supreme Court stated that the phrase "wages, hours, and other terms and conditions of employment" in Section 8(d)[3] defines the subject matter over which the employer and union must bargain.

The Court reasoned that since the ballot clause related solely to the internal affairs of the union, it was a nonmandatory subject of bargaining, and the company's insistence to the point of impasse[4] on such a clause in its contract with its employees constituted a refusal to bargain about the mandatory bargaining items. The Court distinguished the ballot clause from a "no-strike" clause, which is a mandatory subject of bargaining:

A "no-strike" clause prohibits the employees from striking during the life of the contract. It regulates the relations between the employer and the employees. See Labor Board v. American Insurance Co., (supra, [343 U.S.] at 408, n. 22 [, 72 S.Ct. at page 831,

3. 29 U.S.C. § 158(d).

4. The company, of course, could propose the clause in question without violating

Section 8(a) (5) and (1). It is only the insistence on the clause to the point of impasse that constitutes the refusal to bargain about mandatory items.

96 L.Ed. 1027]. The "ballot clause", on the other hand, deals only with relations between the employees and their unions. It substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the "representative" chosen by the employees. It enables the employer, in effect, to deal with its employees rather than their statutory representative. Cf. Medo Photo Corp. v. Labor Board, 321 U.S. 678, [64 S.Ct. 830, 88 L.Ed. 1007]. 356 U.S. at 350, 78 S.Ct. at 723.

In NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the Court held that a union imposition of fines on members who crossed picket lines and returned to work was not a violation by the union of Section 8(b) (1) (A).[5] The basis for the Court's decision was that Section 8(b) (1) (A) was not intended to interfere with the internal affairs of a union and that the imposition of such fines or expulsion from membership was a matter of "internal union discipline."

We think these two cases dispose of the issue before us. It seems clear that since the Union had the right—as an internal Union affair—to discipline by fining, the right not to withdraw the fines is likewise an internal Union affair, and accordingly a matter "involving relations between the employees and their union" within the meaning of *Borg-Warner*, and therefore not a mandatory bargaining item.

The Union's fining of members who break an authorized strike is analogous to the ballot clause, which the *Borg-Warner* Court held to be a non-mandatory bargaining item. Both are matters primarily involving the relations between the employee and his union, al-though both are of some interest to the employer, or the employer would not pursue the point to impasse. Neither ballot clause nor withdrawal of fines for strikebreaking relates to terms or conditions of employment within the meaning of Section 8(d).

Norplex's freedom to insist that the fines be withdrawn would destroy the effectiveness of the Union rule against crossing picket lines. This in turn would permit the employer to strengthen its position vis-a-vis the Union by dealing with "the employees rather than their statutory representative," NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 350, 78 S.Ct. 718, 723 (1958), and, if permitted, would give rise to the same "weakening [of] the independence of the 'representative' chosen by the employees" which was condemned by *Borg-Warner*, and would effectually destroy the Union's economic strike power, a power which the Supreme Court has called "the ultimate weapon in labor's arsenal for achieving agreement upon its own terms."[6] NLRB v. Allis-Chalmers Mfg. Co., *supra* 388 U.S. at 181, 87 S.Ct. 2001 at 2007.

We hold that Norplex's insistence upon withdrawal of the Union imposed fines upon its member-employees who crossed the picket line is a matter between the Union and its members. Under 8(d), Norplex's interest in the Union members and Union is minimal, and Norplex's insistence to the point of impasse that the fines be withdrawn is with respect to a non-mandatory item of bargaining resulting in a refusal to bargain within the meaning of 8(a) (5) and (1).

There is no validity in the attempt to distinguish between the facts in *Allis-*

---

5. Although the union may fine and expel strikebreakers from union membership, it cannot coerce the employer to discharge the strikebreaker from employment. 29 U.S.C. § 158(b) (2).

6. In this case, 13 striking employees crossed the picket line and returned to work. Within six months the Company was able to hire approximately 70 other replacement workers. This suggests that the primary purpose of seeking to withdraw the fines in this case was, not to guarantee employees for the Company during a strike, but rather to weaken the Union rule against strikebreaking.

*Chalmers* and the case before us on the ground that the fines here are excessive and the fines in *Allis-Chalmers* reasonable. Even if excessive, they have no bearing on the issue before us. The Board here made no finding that the fines were excessive, although the Examiner stated he was sympathetic to the respondent's position that the fines were excessive. The reasonableness of the fines is a matter for the state court to determine should the Union seek judicial enforcement of the fines.[7] See NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 193, n. 32, 87 S.Ct. 2001 (1967).

## II.

Petitioner relies on this court's opinion in Allen Bradley Co. v. NLRB, 286 F.2d 442 (7th Cir. 1961), for its view that the Board's order should be set aside. *Allen Bradley* was decided six years before the Supreme Court's decision in *Allis-Chalmers*. The issue in *Allen Bradley* was whether a company-proposed clause—whereby both the company and the union agreed not to restrain or coerce employees in the exercise of their statutory rights, including the right to refrain from any of the specified activities, "by discipline, discharge, fine or otherwise"—was a mandatory subject of bargaining. The court decided that it was, bottoming its decision on two grounds. First, the National Labor Re-

lations Act "permits no impairment of the right of an employee to work, with the corollary right of an employer to utilize his services." [8] Second, the imposition of fines on union members who cross picket lines is "more akin" to the no-strike clause example than to the ballot clause example in *Borg-Warner*.

We think both of these grounds of decision are vitiated by the Supreme Court's decision in *Allis-Chalmers*. The first statement, in so far as it means that a union may not fine members for crossing a picket line—as the dictum 286 F.2d at 446 indicates that it does [9]—is rejected by the holding in *Allis-Chalmers*. *See* Scofield v. NLRB, 393 F.2d 49, 54 (7th Cir. 1968). The second statement, while not expressly rejected by *Allis-Chalmers*, is undermined by that decision. The Court's holding in *Allis-Chalmers* that the union's imposition of the fines was lawful is based on the notion that the fines were a matter of internal union discipline. Accordingly, it follows that such fines would be a matter between the union and its members and, like the ballot clause in *Borg-Warner*, of no legal concern to the employer.

Neither this court's opinion in Scofield v. NLRB, 393 F.2d 49 (1968), nor the Supreme Court's affirmance of *Scofield*, 394 U.S. 423, 89 S.Ct. 1154, 22 L. Ed.2d 385 (1969), supports petitioner's

7. The Board currently is considering whether a union violates Section 8(b) (1) (A) by imposing excessive fines on its members who engage in protected concerted action. This point has not been decided by the Supreme Court. *See* Scofield v. NLRB, 394 U.S. 423, 430, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1968). But even if the fines were excessive, the remedy would be for the company to file an 8(b) (1) (A) charge against the union, not to try to convert an otherwise non-mandatory subject of bargaining into a "term or condition of employment."

8. The relevant paragraph in full is:
    In our view, Borg-Warner furnishes no support for the Board's position in the instant situation; in fact, its rationale points in the opposite direction. Section 7 protects an employee in his right to refrain from concerted activi-

ties and this includes, of course, the right to refuse to participate in or recognize a strike. Coercion or interference with that right, whether by the employer or by the union, is made an unfair labor practice by the terms of the Act. So far as material to the instant situation, the Act permits no impairment of the right of an employee to work, with the corollary right of the employer to utilize his services. 286 F.2d at 445.
    The court later went on to add:
    Coercive action, whether by way of fine, discharge or otherwise, which deprives a member of his right to work and his employer of the benefit of his services, cannot be said to relate only to the internal affairs of the union. Id. at 446.

9. See note 8, *supra*.

contention that *Allen Bradley* is still viable. Both decisions do cast doubt on whether every union rule is a non-mandatory bargaining item.[10]

This court held in *Scofield* that a union's imposition of fines on members for violation of a union production ceiling rule was not unlawful under Section 8(b) (1) (A) of the Act. The court went on to state: "But as *Allen Bradley* stills holds, the Wisconsin Motor Corporation can require the Union to bargain over a demand to give up its ceiling rule." 393 F.2d at 54. This statement does not decide the question before us, namely, whether withdrawal of fines imposed on Union members for crossing the picket line is a mandatory bargaining item. The Supreme Court in its *Scofield* opinion did not expressly consider the question whether the ceiling rule was or was not mandatory. However, Justice White, speaking for the majority, stated:

> It is doubtless true that the union [ceiling] rule in question here affects the interest of all three participants in the labor-management relation: employer, employee, and union. Although the enforcement of the rule is handled as an internal union matter, the rule has and was intended to have an impact beyond the confines of the union organization.
> 394 U.S. at 431–432, 89 S.Ct. at 1159.

We think that this statement affords no support for petitioner's position. Here we have internal Union discipline, i.e., withdrawal of a fine pursuant to a rule aimed at deterring members from crossing picket lines, and neither the rule nor its enforcement by fine "has and was intended to have" any impact on the employer, other than to prevent him from encouraging Union members to by-pass the Union and deal directly with the employer, a practice which was condemned by *Borg-Warner*.

We conclude that Allen Bradley v. NLRB, 286 F.2d 442 (7th Cir. 1961), is no longer viable, and we therefore expressly overrule it as the law of this circuit.[11]

The Order Will Be Enforced.

DUFFY, Senior Circuit Judge (concurring).

I concur in Judge Kiley's opinion. I, personally, am of the view that the union fines of $500 each, levied on women workers who were working or helping to support their families, were excessive and unreasonable. The Trial Examiner was, apparently, of the same view.

However, in N.L.R.B. v. Allis Chalmers Manufacturing Company, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the Court held that Section 8(b) (1) (A) of the Act was not intended to interfere with the internal affairs of a union. The Court also held that the imposition of fines on members who crossed picket lines and returned to work was a matter of "internal union discipline."

In view of the decision in *Allis-Chalmers Manufacturing Company, supra,* it seems clear to me that we must reach the conclusion set forth by Judge Kiley.

PELL, Circuit Judge (dissenting).

I must respectfully dissent as it seems to me the majority opinion can only but lead to the imposition of a double standard in the scope of subjects for mandatory negotiations under the National Labor Relations Act.

Without intending to disagree with, nor unnecessarily to duplicate, the statement of the factual situation here involved as contained in the majority deci-

---

10. If all union rules were non-mandatory bargaining items, the union could avoid its obligation to bargain by merely incorporating into a union rule the area concerning which it does not wish to bargain.

11. Since this opinion overrules Allen Bradley v. NLRB, 286 F.2d 442 (7th Cir. 1961), we have circulated the opinion to all the judges of this court in regular active service, and a majority has voted not to rehear *en banc* the matter of overruling the *Allen Bradley* decision.

sion, I do note certain additional undisputed matters, in part as background and in part because of their significance to the instant decision.

From the time of the union certification in 1958, the Union and the company enjoyed harmonious relationships for a period of 10 years. A number of bargaining sessions occurred in 1968 prior to the economic strike beginning on May 14, 1968.

As indicated in the majority opinion, 13 of the striking employees returned to work, this being during the period from June 15 to August 26, 1968.

Some of the striking employees who did return to work had been strong Union adherents. Two of them had joined the Union shortly before the strike and were among the first to return to work. Each was fined $500 by the Union because of returning to work while the strike was still in effect. On the other hand, others had held various positions with the Union but nevertheless each was fined $500. In its brief the Board states that each of the 13 employees was fined either $300 or $500. The majority opinion speaks of a range of fines from $300 to $500. The only support I find in the record for any figure less than $500 was in the testimony of the negotiation representative of the Union who stated to the best of his recollection the range of fines was $500 and $300. The employees involved who testified, all testified $500, and the trial examiner in his findings of fact indicated that the employees each were fined approximately $500. In any event, obviously no employee was fined less than $300 and apparently substantially all, if not all, of the employees were actually fined $500.

There was evidence at the hearing indicative of a low scale of pay in the area and in this particular plant and that difficult financial situations motivated the return to work of the erstwhile strikers.

The last contract which expired on March 31, 1968 had a maintenance of membership provision. At the initiation of the strike, while 54 employees did not come to work, the company continued to operate the plant and did hire replacements. The picketing was for the most part peaceful.

On this appeal, Norplex strenuously contends that on the hearing before the trial examiner the Board General Counsel had failed to sustain an essential element of the case, i.e., proof that the Union represented a majority of employees in the unit during the period of negotiations here involved. S & M Manufacturing Co., 172 NLRB No. 104 (1968).

The majority opinion disposes of this issue by finding "no merit in the contention of Norplex that there is not substantial evidence in the record as a whole to support the finding that the Union represented the majority during the period of negotiation." At the hearing the General Counsel had pleaded surprise because the company had not offered the question as an affirmative defense. The company, however, had, it contends, by general denial placed the matter of majority status in issue. While the trial examiner disagreed with the necessity of proving this matter, he did offer the General Counsel an opportunity, if he so desired, to put in evidence that the Union presently had a majority. The General Counsel declined the opportunity.

Further, the majority opinion states that the October 21, 1968 Settlement Agreement required Norplex to bargain with the Union. The Settlement Agreement itself is at best ambiguous and while no doubt, even if there were not specific proof offered on the matter by the General Counsel, "the substantial evidence" rule would be applicable, there is nevertheless a slender reed of support for there being majority status in the Union. The certification of the Union had been more than 10 years prior to the period in controversy. On November 7, 1968 there were 112 employees doing bargaining unit work in the plant with 41 outside on strike. On November 20 there were either 115 or 120 in the plant and 41 outside.

It appears to me that there would be ample basis for finding no substantial evidence of the majority status from the record as a whole. However, the more important issue in this case, it seems to me, is the matter of the subject of negotiations since the company and the Union did in fact continue to meet and negotiate.

On December 6, 1968, following the negotiating sessions of November 7 and 20, the regional compliance officer of the Board advised Norplex that the Union had complained that the employer was not bargaining in good faith as directed in the Settlement Agreement. Under date of December 16, 1968, Norplex sent the compliance officer a thirteen page, single-spaced letter setting forth with great particularity the details of the various negotiating sessions and other contacts between the interested parties. Included therein were several references to the company's position that an agreement would be dependent upon the Union agreeing not to enforce nor impose fines or other discipline on those union members who crossed the picket line to come to work. The letter contended that the company had in all good faith complied with the Settlement Agreement and had met with and bargained in good faith with the Union. On January 30, 1969 the regional director notified the Union that in view of the compliance with the affirmative provisions of the Settlement Agreement, an earlier August 28, 1969 unfair labor practice case was closed.

However, on December 18, 1968, two days after the company's letter, the Union again filed unfair labor practice charges alleging violations of section 8(a) (5) and (1) of the Act, basing this on the insistence by the company that the Union bargain about or rescind fines levied on its members who crossed the picket lines and returned to work. Efforts to work out a settlement agreement were unsuccessful and under date of March 4, 1969 the regional director issued the complaint here involved. A further bargaining session thereafter

early in March, 1969 proved fruitless. During all of the meetings, various other subjects were discussed and on some of these, at least, no agreement even of a tentative nature was reached. The Union, among other things, was seeking provisions for increased union security.

The complaint is apparently based upon the assumption that an impasse was reached on November 7, 1968. The Board contends that Norplex cannot rely on the compliance letter of January 30, 1969 since that indicated that no further action would be taken if compliance continued. While Norplex does not seem to place any particular reliance on the compliance letter, it is of interest to note that the letter was issued after a detailed report from the company indicating, *inter alia,* that the company was standing on its position that the fines should be a subject of negotiations. It is of further interest to note that the Board in its brief states that "the Company thereafter [after October 1968] bargained with the Union until negotiations broke down in March 1969." Obviously reference in part at least must be to the negotiating session which occurred subsequent to the issuance of the complaint. Here also there appears to me to be a real question of whether there is substantial evidence to support the Board's order insofar as it determines that negotiations had reached an impasse. The majority opinion assumes, without discussion, this crucial fact.

Assuming arguendo, however, that the Union still was the majority bargaining representative and that an impasse was reached in November, we come to the question of primary importance which is whether or not Norplex in insisting that the Union agree to a contract provision relating to the matter of the fines was, in so doing, insisting on negotiations on a mandatory or non-mandatory subject of bargaining. If the subject was non-mandatory, then the good faith of Norplex would not here protect it. N.L.R.B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). As did the Court

in Borg-Warner, I first turn to the relevant provisions of the statute in resolving the question here presented. These are as follows:

"[Sec. 8] (a) It shall be an unfair labor practice for an employer—

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) [Sec. 9] of this title." 29 U.S.C. § 158(a) (5).

"[Sec. 9] (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *." 29 U.S.C. § 159(a).

"[Sec. 8] (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." 29 U.S.C. § 158(d).

In *Borg-Warner*, the company had insisted upon a "ballot" clause calling for a pre-strike vote of all the employees as to the employer's last contractual offer. The Supreme Court in a five to four decision held that the "ballot" clause related only to the procedure to be followed by employees among themselves before their representative could call a strike or refuse a final offer. The "ballot" clause, said the Court, "deals *only* with relations between the employees and their unions." *Id*. at 350, 78 S.Ct. at 723. Accordingly, the Court found that the particular clause was not within the mandatory ambit.

I do not suggest disagreement with the particular holding with regard to this internal procedural device of the Union. However, in considering whether the proposed contractual provision in the matter before us is or is not a subject of mandatory negotiation, I also note the cogency of some of the statements in the dissenting opinions which I believe the majority in *Borg-Warner* would have found acceptable in principle. Mr. Justice Frankfurter in dissenting aptly referred to the "rather vague scope of the obligatory provisions of § 8(d)." *Id*. at 351, 78 S.Ct. at 723.

Mr. Justice Harlan, with whom two other justices joined in dissenting, made the following cogent statement:

"The right to bargain becomes illusory if one is not free to press a proposal in good faith to the point of insistence. Surely adoption of so inherently vague and fluid a standard is apt to inhibit the entire bargaining process because of a party's fear that strenuous argument might shade into forbidden insistence and thereby produce a charge of an unfair labor practice." *Id*. at 352, 78 S.Ct. at 724.

Mr. Justice Harlan also stated:

"Provisions which two decades ago might have been thought to be the exclusive concern of labor or management are today commonplace in such agreements." *Id*. at 358, 78 S.Ct. at 727. (Footnote omitted.)

It seems clear that "terms and conditions of employment" should not be, particularly in the still developing field of labor relations, a static concept.[1] It

1. Well before the initial enactment of the National Labor Relations Act, Mr. Justice Brandeis in a dissenting opinion observed: "The history of the rules governing contests between employer and employed in the several English-speaking countries illustrates both the susceptibility of such rules to change and the

should grow with the times and always be considered, in my opinion, in the context of "* * * encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions * * *." 29 U.S. C. § 151. In other words, the stated purpose of eliminating the causes of substantial obstruction to the free flow of commerce is ultimately best accomplished by achieving industrial harmony. In the case before us, substantial fines were levied on people who were receiving a relatively minimal rate of pay and who were in economic need which necessitated their return to work.[2] An extended strike had been involved. The trauma of industrial strife such as here involved leaves wounds that heal slowly at best and scarcely at all when the salt of retribution is copiously applied.

No employer should be blind to the fact that a plant operates more effectively if harmony exists among the personnel. In the case before us Norplex obviously recognized, notwithstanding the fact that it had continued in operation throughout, that industrial harmony would be maximized if forgiveness were practiced. On the one side of the coin, in October 1967 Norplex entered into a Settlement Agreement which offered reinstatement to striking employees without loss of seniority or their rights and privileges. Hence, it was not necessary for the Union in its negotiations to make this demand.[3] Conversely, Norplex reasonably requested that strikers who had already returned to work not be penalized by the Union.

"Other terms and conditions of employment" have been said to be in part referring "to the relations between the parties which resulted in the performance of work." Local 164 v. N.L.R.B., 110 U.S.App.D.C. 294, 293 F.2d 133, 135 (1961), cert. den. 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961).

It seems clear to me that in the overall picture involved here, the matter of remission of fines was a mandatory subject of negotiation.

In so thinking I have perhaps relied on a priori considerations, although the question here posed is disposed of by a previous decision of this circuit. Allen Bradley Company v. N. L. R. B., 286 F.2d 442 (7th Cir. 1961). It is necessary to take a fresh look at the matter, however, because of the firm insistence of the Board that *Allen Bradley* is no longer law.

In *Allen Bradley*, fourteen members of the Union during a strike had crossed the Union's picketline. After the con-

variety of contemporary opinion as to what rules will best serve the public interest." Truax v. Corrigan, 257 U.S. 312, 357, 42 S.Ct. 124, 139, 66 L.Ed. 254 (1921).

In Aeronautical Industrial District Lodge 727 v. Campbell, et al., 337 U.S. 521, 525, 69 S.Ct. 1287, 1289, 93 L.Ed. 1513 (1949), Mr. Justice Frankfurter put the matter as follows: "It is of the essence of collective bargaining that it is a continuous process. Neither the conditions to which it addresses itself nor the benefits to be secured by it remain static."

2. The trial examiner in his decision stated in part the following:

"* * * I am not unsympathetic with Respondent's position that the fines in the circumstances of this case appear to be excessive and might tend to inflict undue hardship upon the union employees who returned to work during the strike. Thus, six female employees, each of whom were fined $500, testified that they abandoned the strike and returned to work because of personal financial difficulties, such as the need to support themselves and their children. The wage rates of these employees ranged between $1.66 and $1.88 per hour."

3. In the November meetings, the Union did negotiate on the matter of whether time not worked while on strike would count for vacation purposes but the Union remained adamant with regard to discussing the matter of fines. There was no apparent willingness on the part of the Union even to consider a reduction of the fines to a reasonable basis in the face of Norplex's insistence that it was management business when the employees were faced with "such severe discipline."

clusion of the strike each of the employees was fined $100 by the Union. In this respect, the case before us is a much stronger case because of the excessiveness of the fine. At a collective bargaining session in *Allen Bradley*, the company submitted two alternative proposals, the effect of which was that the Union would not interfere by fine or otherwise with the employee's exercise of rights guaranteed by § 7 of the Act. The Board found that the company's insistence upon the proposals constituted a refusal to bargain. This court considered and distinguished *Borg-Warner, supra*, 356 U.S. 342, 78 S.Ct. 718, and refused to accept the Board's argument that what the company sought to accomplish was essentially different or distinguishable from a nonstrike clause which is admittedly a subject of mandatory bargaining. This court in *Allen Bradley* further considered that a course of action in the matter of a fine which would have the substantial effect of depriving the employer of the benefit of services of the employee cannot be said to relate only to the internal affairs of the Union. This court held therefore that the company in *Allen Bradley* by its insistence on the proposed clauses committed no unfair labor practice. The Board contends that the Supreme Court's decision in N.L.R.B. v. Allis-Chalmers Mfg. Co., *supra*, 388 U.S. 175, 87 S.Ct. 2001, undercuts *Allen Bradley*.[4]

The decision of this court in Allis-Chalmers Mfg. Co. v. N.L.R.B., 358 F.2d 656 (7th Cir. 1966), which relied upon the prior ruling of *Allen Bradley*, was reversed by the United States Supreme Court in N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001 (1967). The point in issue, however, in *Allis-Chalmers* was not the same as in

*Allen Bradley* nor as in the case before us. *Allis-Chalmers* establishes that section 8(b) (1) (A) did not prohibit the imposition of *reasonable* fines on Union members who declined to honor an authorized strike nor to prohibit attempts to collect such fine. The Board cites numerous cases to the same effect and it is now well established nothing in the National Labor Relations Act, as amended, does preclude the imposition by a Union of fines, at least of a reasonable nature.[5]

The matter before us concerns whether the Union in exercising its admitted right to impose fines, nevertheless has to negotiate on the matter of adherence to those fines just as the company has to negotiate on numerous matters which many companies have unsuccessfully contended were their own internal affairs.

The statutory duty to bargain is a mutual obligation and not one to be imposed upon the employer only.

Looking at the matter from the employer's side, it has been held that company houses may be a proper subject of collective bargaining even though they are not a necessary part of the enterprise and their occupancy does not affect the worker's pay, it being sufficient to bring them within the field of collective bargaining if their ownership and management materially affects the condition of employment. N.L.R.B. v. Lehigh Portland Cement Co., 205 F.2d 821 (4th Cir. 1953). In the case before us, under the particular circumstances no imaginative effort is required to determine that the fines materially affected the conditions of employment of the employees involved.

A company decision to withdraw from employees the privilege of hunting on the employer's forest land was ruled to

---

4. The Board, however, more than three years prior to *Allis-Chalmers* had taken the position that it did "not acquiesce" in *Allen Bradley* and therefore did not follow it. Automobile Aircraft and Agricultural Implements Workers of America, et al. 145 NLRB No. 109 (1964).

5. The Court in *Allis-Chalmers* refrained specifically from expressing a view on whether § 8(b) (1) (A) proscribed arbitrary imposition of fines, N.L.R.B. v. Allis-Chalmers Mfg. Co., *supra*, 388 U.S. at 195, 87 S.Ct. 2001, and the Court's decision was with reference to reasonable fines. Id. at 193, 87 S.Ct. 2001.

be a subject of mandatory bargaining. Southland Paper Mills, Inc., 161 NLRB No. 101 (1967). An employer's decision to discontinue its trucking operations and to subcontract all its transportation work, regardless of economic justification, was ruled to be a subject of mandatory bargaining. N.L.R.B. v. American Mfg. Co. of Texas, 351 F.2d 74, 80 (5th Cir. 1965). *See, also* Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). An employer was ruled to bargain collectively with its Union about the effect on its employees of a decision to sell the major part of its business. Young Motor Truck Service, Inc., 156 NLRB No. 56 (1966). *See also Nelson Co.*, 157 NLRB No. 85 (1966).

Thus, it is evident that in many instances because of the impact upon employees, matters which might be deemed internal affairs of the company have been held to be the subject of mandatory bargaining. Failure to reach a similar result in the instant case does seem to me, as indicated at the outset of this dissent, to be creating a double standard which has no place in the mutuality of labor negotiations.

I am unable to dispose of the issue as does the majority by stating that the insistence by the Union on the enforcement of its excessive fines neither had, nor was intended to have, any impact on the employer. It might not have been intended to have impact on him but it undoubtedly nevertheless would have a substantial effect. Obviously, the insistence on the payment of the fine would leave little practical choice to the employees other than to leave the employment and thereby attempt to avoid the payment of the fines.

This court as long ago as 1941, in considering the duty to bargain, refused to accept the contention of an employer that negotiations contemplate an agreement for future activities but do not contemplate a settlement of past grievances. N. L. R. B. v. Bachelder, 120 F.

2d 574 (7th Cir. 1941), cert. den. 314 U. S. 647, 62 S.Ct. 90, 86 L.Ed. 519 (1941).

As was pointed out by this court in Inland Steel Co. v. N.L.R.B., 170 F.2d 247, 255 (7th Cir. 1948), aff'd 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), the decision being unanimous on this point, Congress in the Act used the phrase "other conditions of employment" instead of the phrase "working conditions" which it had previously used in the Railway Act. In this court's opinion it was obvious that the phrase later used by Congress was more inclusive than that which it had formerly used. This case was affirmed sub. nom. American Communications Assn. v. Douds, 339 U. S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950). The matter before the Supreme Court involved another aspect of the case.

The differentiation between the matter involved in *Allen Bradley, supra,* and *Allis-Chalmers, supra,* is that in the latter the courts were dealing with a flat prohibition of the exercise of an internal matter involving the Union; while in *Allen Bradley* the situation involves negotiations where there is an impact upon the employees in their conditions of employment, with the Union not having to accede to the company's negotiating demand.

Nor is it any answer to this differentiation to say that a situation involving a strong company and a weak Union might force the Union to accede on the issue. This begs the question as this argument would be applicable to any admittedly mandatory subject of negotiation including the establishment of wage rates themselves.

The Board finally contends that *Allen Bradley, supra,* is no longer viable and that the matter is definitely laid to rest by this court's decision in Scofield v. N. L.R.B., 393 F.2d 49 (7th Cir. 1968), aff'd 394 U.S. 423, 89 S.Ct. 1154 (1969). I would not so hold. *Scofield* as a matter of fact carefully makes the differentiation to which I have here referred. Thus, Judge Cummings at page 54 of

the decision for the majority states in effect that while that part of *Allen Bradley* which purported to disapprove Union fines was no longer viable, nevertheless, "[A]s *Allen Bradley* still holds, the *Wisconsin Motor Corp.* can require the Union to bargain over a demand to give up its ceiling rule."

For the reasons set forth herein, I would grant the petition of Norplex and set aside the order of the National Labor Relations Board issued against the company on November 21, 1969 and deny the Board's cross-application for enforcement of said order.