NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 322, AFL–CIO and Bechtel Power Corporation, Respondents,

Paul H. Robertson, Intervenor.

No. 77–1720.

United States Court of Appeals, Tenth Circuit.

Argued March 12, 1979.

Decided May 4, 1979.

Kenneth Hipp, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman and Alan Banov, N. L. R. B., Washington, D. C., on the brief), for petitioner.

J. E. Vlastos of Cardine, Vlastos & Reeves, Casper, Wyo. (Laurence J. Cohen and Robert D. Kurnick of Sherman, Dunn, Cohen & Leifer, Washington, D. C., on the brief), for respondent Intern. Broth. of Elec. Workers, Local 322, AFL–CIO.

* The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. The orders were based on the NLRB's conclusion that the Union had violated section 8(b)(1)(A) and (2) of the National Labor Relations Act ("Act") and that Bechtel had violated Section 8(a)(1) and (3) of the Act. Bechtel takes no position on any issue involved herein.

Leslie W. Bailey, Jr. of the National Right to Work Legal Defense Foundation, Fairfax, Va., for intervenor.

Before HOLLOWAY and BARRETT, Circuit Judges, and MILLER, Judge.*

MILLER, Judge.

This case is before the court on an application by the National Labor Relations Board ("NLRB") for an order enforcing its orders against the International Brotherhood of Electrical Workers, Local No. 322, AFL–CIO ("Union"), and Bechtel Power Corporation ("Bechtel").¹ These orders, which, with one modification of significance here, are the same as those recommended by the Administrative Law Judge ("ALJ"), directed *inter alia* that the Union and Bechtel cease and desist from maintaining, enforcing, or otherwise giving effect to an exclusive hiring hall contractual arrangement in a manner excluding nonunion members from the hiring hall or requiring nonunion members to be hired only as temporary employees; that the Union notify Bechtel that it has no objection to the immediate and full reinstatement of discriminatees Carl Coates, Virgil Brown, Richard Loeffler, Paul Robertson, Gene Olschewski, Val Zinke, and Steve Hudspeth² to their former jobs, or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges; that Bechtel offer said individuals immediate and full reinstatement to their former jobs, or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges; that the Union and Bechtel jointly and severally make said individuals whole for any loss of earnings they may have suffered as a result of the discrimination against them because of their nonunion status; and that

2. The ALJ recommended dismissal of that portion of the complaint which alleged that Steve Hudspeth was terminated in violation of the Act. Member Walther of the three-member NLRB panel agreed, but the other two members held that Hudspeth was unlawfully denied employment.

the Union register discriminatee Harold Hudson at its exclusive hiring hall and make him whole for any loss of earnings he may have suffered by reason of lost opportunity for referral to Bechtel.[3] Except with respect to Hudspeth, the NLRB affirmed the findings and conclusions of the ALJ regarding the above-named individuals. In pertinent part, the findings are set forth below.

### Findings of ALJ (Affirmed by NLRB)

During the period involved (1974–75), Bechtel was building a major power plant, known as the Jim Bridger Power Plant, at Point of Rocks, Wyoming. It required the services of large numbers of electricians and obtained them under a collective-bargaining agreement with the Union. Article V of the agreement provided for an exclusive hiring hall and established four groups for job referrals. In order of priority, these were:

*Section 5.06   Group I*

All applicants for employment who have four (4) or more years experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman's examination given by a duly constituted Local Union of the IBEW, and who have been employed for a period of at least one (1) year in the last four (4) years under a collective bargaining agreement between the parties of this Addendum.

*Section 5.07   Group II*

All applicants for employment who have four (4) or more years experience in the trade, and who have passed a Journeyman's examination given by a duly constituted Local Union of IBEW.

*Section 5.08   Group III*

All applicants for employment who have two (2) or more years experience in the

trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six (6) months in the last three (3) years in the trade under a collective bargaining agreement between the parties to this Addendum.

*Section 5.09   Group IV*

All applicants for employment who have worked at the trade for more than one (1) year.

The referral procedure permitted Bechtel to hire temporary employees "at the gate" when the hiring hall could not send applicants within forty-eight hours after Bechtel's request, thus:

*Section 5.10*

If the registration list is exhausted and the Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and Holidays excepted, the Employer shall be free to secure applicants without using the referral procedure, but such applicants, if hired, shall have the status of temporary employees. The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such temporary employees, and shall replace such temporary employees as soon as registered applicants for employment are available under the referral procedure.

By July of 1974 Bechtel concluded that the Union was not supplying enough electricians through the hiring hall to meet its requirements and notified the Union that, unless substantial progress was made in meeting its current need for ninety-one journeymen electricians, it would proceed under Article V, section 5.10.[4] (At the time, Bechtel was employing some two hun-

---

**3.** Details of the "make whole" arrangement for the various individuals were specified by the ALJ in his decision.

**4.** Those listed in groups I and II were all shown to be members of a local of the International Brotherhood of Electrical Workers ("IBEW") and, with few exceptions, all were referred for employment within a few days after being list-

ed. Those listed in groups III and IV apparently had no union affiliation; of the same 175 so listed, none (except for three specially qualified welders) was referred to Bechtel's Jim Bridger project after Bechtel began hiring at its gate, although Bechtel had outstanding orders for electricians.

dred electricians.) It placed advertisements in a number of newspapers in the Rocky Mountain area and sent form letters to applicants who qualified, instructing them to report directly to the jobsite.

By late November of 1974 Bechtel was employing some four hundred electricians at its Jim Bridger project, including those hired at the gate. A reduction in force was then begun by Bechtel and, in conformity with advice to Bechtel's representative from the business agent of the Union (that, as long as there were temporary employees on the jobsite, qualified applicants referred from the hiring hall must be accepted for employment), all but two of the temporary "gate hires" were laid off on December 10. These included Coates, Brown, Loeffler, Robertson, Olschewski, and Zinke who, because of their nonunion status, had been effectively precluded from using the Union's exclusive hiring hall for job-referral.

When he arrived in Wyoming from Iowa, Coates spoke on the telephone to a person at the hiring hall who identified himself as a business agent and, when informed by Coates that he was nonunion, said there was nothing he could do for Coates regarding referral; at that time, Bechtel needed a person with Coates' qualifications, and he was hired at the gate the next day. On December 13, after being laid off, Coates again called the hiring hall, using an assumed name, and stated that he was a member of another local. The business agent told him to come to the hall and sign the referral book and said that he thought he could refer him for a job. Loeffler and Robertson went to the hiring hall and spoke to the business agent who, upon being informed that they were nonunion, stated that he had not referred any nonunion electricians for months and that they would be wasting their time to try to find jobs themselves; nevertheless, they were hired at the gate. Zinke went to the hiring hall, and when he was asked whether he was a paid-up union member, replied in the negative. He was told that no work was available, but, nevertheless, he was hired at the gate. Brown, who was nonunion, did not contact the hiring hall directly, but was told by Bechtel's representative when he was hired

at the gate that he did not need to go to the hiring hall. From the experience of Coates, Loeffler, Robertson, and Zinke, contacting the hiring hall would have been unproductive. Also, after being laid off, Brown contacted the business agent, but was told that no work was available and to go elsewhere—this occurring shortly after Coates, using an assumed name and stating that he was a union member, had been told to come in and sign the referral book with a possibility of referral. Similarly, Olschewski did not contact the hiring hall directly, but was told by Loeffler and Robertson of their experience. It was reasonable for him to conclude that it would be futile for him to seek referral from the hiring hall; like the others, he was hired at the gate.

In January of 1975, Hudson saw a job order from Bechtel stating that all journeymen inside wiremen must have current IBEW status. When he inquired for work at Bechtel, he was advised that all referrals were from the hiring hall and that no jobs were available. When he went to the hiring hall, he was told by the business agent that nonunion applicants had not been referred for six months and that it would be several more months before there was any chance of referring anyone. Hudson asked whether it would help if he reinstated his membership in another local and was told it wouldn't do any good. Because Bechtel was not hiring people in Hudson's classification at the time he inquired for work and, indeed, was laying off employees from December of 1974 through June of 1975, Hudson obviously was not refused a job because he had not been referred from the hiring hall, and the failure of the Union to refer him did not result in Bechtel's refusal to hire him. However, Hudson was denied access to the hiring hall procedure, for the business agent did not ask him to sign the referral book or inform him of his right to participate in the hiring hall procedure for whatever work became available in the future.

As to Hudspeth, the ALJ noted that he had not testified and said that the evidence of record "does not support a finding that Hudspeth was laid off in violation of the Act" and that "[i]t does not even establish

that he was employed or laid off by Bechtel." However, the NLRB found that Loeffler had testified that Hudspeth was a member of a crew at the jobsite under foreman Paul Certain; also, that Zinke, Coates, and Hudspeth went to see Bechtel's representative about their layoff (which had occurred the day before). The Union in its brief states that each of the discriminatees (except for Hudson) was a gate hire.

## OPINION

It is well settled that a union is in violation of section 8(b)(1)(A) and (2) of the Act and an employer is in violation of section 8(a)(1) and (3) of the Act if they discriminate, on the basis of union membership, in the operation of an exclusive hiring hall agreement.[5] Discrimination occurs, for example, when only union members have access to the hiring hall,[6] or when employment is refused to nonunion job applicants,[7] or when the tenure of nonunion employees is restricted.[8] The decisive question before us is whether substantial evidence in the record as a whole supports the above findings which, if so supported, indicate violations of the Act.[9] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

As to Coates, the Union points out that he had been assured of a job by Bechtel's representative before he arrived in Wyoming; that at no time did he go to the offices of the Union or the hiring hall, although he knew that to sign the referral book he had to appear in person at the hiring hall. The fact remains, however, that when he called the hiring hall and stated that he was nonunion, he was told that there was nothing that could be done for him; it would have been futile to have followed the hiring hall procedures in order to be referred so that his job would not be that of a temporary gate hire. Regarding Loeffler and Robertson, the Union stresses that they did not ask to sign the referral book, nor were they refused the right to sign it. However, they were not offered an opportunity to sign the book, and even if they had done so, the evidence shows that, as nonunion applicants in category III or IV, they would in all likelihood not have been referred. The Union points out that Zinke testified he would not have gone to the hiring hall to be referred had he not been told to do so by a Bechtel employee. The fact is that he did go and, upon indicating that he was nonunion, was erroneously told no work was available. The Union argues that Brown did not contact the hiring hall until after he had been terminated. However, because he was nonunion, contacting the hiring hall for referral would in all likelihood not have been productive, and he would have had to follow the gate hire procedure in order to take a job, which he did. The same can be said for the Union's argument on Olschewski. With respect to Hudspeth, Loeffler testified that he was a member of a crew at the jobsite under foreman Paul Certain; and Zinke testified that he, Coates, and Hudspeth went to see Bechtel's representative on the day after the gate hires were laid off. From this, we

5. *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 674–75, 81 S.Ct. 835, 839, 6 L.Ed.2d 11, 17 (1961).

6. *NLRB v. Local 269, Int'l Bhd. of Electrical Workers*, 357 F.2d 51, 55 (3d Cir. 1966); *see Local 138, Int'l Union of Operating Engineers v. NLRB*, 321 F.2d 130, 134 (2d Cir. 1963); *NLRB v. Construction Specialties Co.*, 208 F.2d 170, 173 (10th Cir. 1953).

7. *Radio Officers' Union v. NLRB*, 347 U.S. 17, 42, 74 S.Ct. 323, 336, 98 L.Ed. 455, 478 (1954); *NLRB v. International Longshoremen's Union, Local 13*, 549 F.2d 1346, 1353–54 (9th Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 397, 54 L.Ed.2d 279 (1977); *NLRB v. Construction Specialties Co., supra.*

8. *NLRB v. Bulletin Co.*, 443 F.2d 863 (3d Cir. 1971), *cert. denied sub nom. Philadelphia Newspaper Printing Pressman's Union Local No. 16 v. NLRB*, 404 U.S. 1018, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972); *Ward v. NLRB*, 462 F.2d 8 (5th Cir. 1972); *see NLRB v. Brotherhood of Painters, Local 419*, 242 F.2d 477, 481 (10th Cir. 1957).

9. Discriminatory acts of the Union in the operation of the hiring hall would be properly chargeable to Bechtel as well. *Morrison-Knudsen Co. v. NLRB*, 275 F.2d 914 (2d Cir. 1960), *cert. denied*, 366 U.S. 909, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961).

are satisfied that the NLRB properly inferred that Hudspeth was a temporary gate hire, nonunion employee who had been laid off; further, "from the facts of this case," that if Hudspeth had sought referral from the Union's hiring hall it would have been futile. The "facts of this case" referred to by the NLRB clearly establish that non-union applicants were not (except in the case of three specially qualified welders) referred from the hiring hall.

Concerning Hudson, the Union relies on the fact that, as a former member of the IBEW, he was aware of the hiring hall procedures and, nevertheless, did not request to sign the referral book. This raises the issue of whether the Union had an affirmative duty to offer him the opportunity to sign the referral book. Under the circumstances of this case, which show a pattern of discrimination against nonunion applicants, some positive action, such as suggesting that Hudson sign the referral book, was required to avoid a reasonable inference that Hudson was denied access to the hiring hall procedure.

In view of the foregoing, we hold that substantial evidence in the record as a whole supports the findings of the NLRB hereinabove set forth.

The orders will be enforced.